Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Co.,*
*GEICO Indemnity Co, GEICO General Insurance Company*
*and GEICO Casualty Co.*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
GOVERNMENT EMPLOYEES INSURANCE CO., GEICO
INDEMNITY CO., GEICO GENERAL INSURANCE
COMPANY and GEICO CASUALTY CO.,

                Plaintiffs,

              -against-

ZENAIDA REYES-ARGUELLES, M.D.,

              -and-

ARGUELLES M.D., P.C.,
VINCENT MEDICAL SERVICES, P.C.,

              -and-

PAVEL SOLTANOV a/k/a PAUL SOLTANOV a/k/a
PAUL DADA,

              Defendants.
------------------------------------------------------------------------X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by Jury**

## COMPLAINT

      Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General

Insurance Company and GEICO Casualty Co. (collectively "GEICO" or "Plaintiffs"), as and for

their Complaint against the Defendants, hereby allege as follows:

**NATURE OF THE ACTION**

1.    This action seeks to recover more than $1,050,000.00 that the Defendants wrongfully have obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance bills relating to healthcare services (i.e., initial and follow-up examinations, diagnostic testing, pain management injections, and physical therapy)(collectively the "Fraudulent Services") that allegedly were provided to persons involved in New York automobile accidents ("Insureds").

2.    In addition, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1,396,000.00 in pending no-fault insurance claims that have been submitted through Zenaida Reyes-Arguelles, M.D. ("Dr. Arguelles"), as well as through Arguelles M.D., P.C. ("Arguelles PC") and Vincent Medical Services, P.C. ("Vincent PC")(collectively the "PC Defendants") because:

    (i)    the PC Defendants are fraudulently incorporated, owned and controlled by a non-physician and, therefore, are ineligible to recover no-fault benefits;

    (ii)    Dr. Arguelles and the PC Defendants engage in unlawful fee splitting with a non-physician and, therefore, are ineligible to recover no-fault benefits; and

    (iii)    in many cases, the Fraudulent Services – to the extent that they are performed at all – have been performed by independent contractors, rather than by the PC Defendants' employees.

3.    The Defendants fall into the following categories:

    (i)    The PC Defendants are fraudulently incorporated New York medical professional corporations, through which most of the Fraudulent Services purportedly have been performed and billed to insurance companies, including GEICO.

    (ii)    Defendant Dr. Arguelles is a physician who formerly was licensed to practice medicine in New York, who falsely purports to own the PC Defendants, and who in some cases has permitted billing for the Fraudulent Services to be submitted in her own name rather than in the name of one of the PC Defendants.

(iii)   Defendant Pavel Soltanov a/k/a Paul Soltanov a/k/a Paul Dada ("Soltanov") is not and never has been licensed to practice medicine. Even so, Soltanov secretly and unlawfully owns and controls the PC Defendants in contravention of New York law.

4.      As discussed below, the Defendants at all relevant times have known that (i) Dr. Arguelles never has ever truly owned or controlled the PC Defendants, through which most charges for the Fraudulent Services have been submitted; (ii) the PC Defendants always have been secretly and unlawfully owned and controlled by Soltanov, who never has been licensed to practice medicine; (iii) the financial and operational relationships between the Defendants have been created to allow Soltanov to secretly own and control the PC Defendants and to illegally split fees with the PC Defendants and Dr. Arguelles by funneling insurance proceeds paid to the PC Defendants and Dr. Arguelles by insurers (including GEICO) to Soltanov; and (iv) the Fraudulent Services, to the extent that they have been performed at all, in many cases have been performed by independent contractors, rather than by the PC Defendants' or Dr. Arguelles' employees. As such, the PC Defendants and Dr. Arguelles never have had any right to be compensated for the Fraudulent Services.

5.      The charts attached hereto as Exhibits "1" and "2" summarize, in part, the fraudulent claims that have been identified to-date that the Defendants have submitted, or caused to be submitted, to GEICO.

6.      The Defendants' fraudulent scheme began in 2004 and has continued uninterrupted since that time. As a result of the Defendants' scheme, GEICO has incurred damages exceeding $1,050,000.00.

## THE PARTIES

I.    **Plaintiffs**

7.    Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. are Maryland corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

II.   **Defendants**

A.    **Dr. Arguelles**

8.    Defendant Dr. Arguelles is a physician who was licensed to practice medicine in New York between April 28, 1986 and October 31, 2011. Dr. Arguelles resides in and is a citizen of New York.

9.    Dr. Arguelles serves as the nominal or "paper" owner of the PC Defendants, and in some cases has permitted billing for the Fraudulent Services to be submitted in her own name rather than in the name of one of the PC Defendants.

10.   In an April 13, 2011 Determination and Order (the "April 2011 Order"), the New York State Department of Health Board for Professional Medical Conduct (the "State Board") fined Dr. Arguelles $10,000.00, suspended her medical license for five years, stayed the suspension, placed Dr. Arguelles on probation for five years, and restricted Dr. Arguelles' practice during the probationary period to Veteran's Administration facilities and facilities operating pursuant to Article 28 of the New York Public Health Law. A copy of the April 2011 Order is annexed hereto as Exhibit "3".

11.   The State Board imposed the penalties in the April 2011 Order after determining, among other things, that Dr. Arguelles had committed 54 specifications of misconduct, including

4

negligence on more than one occasion, incompetence on more than one occasion, gross negligence, gross incompetence, unwarranted tests and treatment, fraudulent practice, willfully making and filing false reports, failing to maintain patient records, and moral unfitness. See Exhibit "3".

12.     In the April 2011 Order, the State Board noted that all of Dr. Arguelles' misconduct had been committed while purporting to treat no-fault Insureds at the 1468 Flatbush Avenue, Brooklyn New York facility from which the PC Defendants operated (the "Flatbush Avenue Facility"). See Exhibit "3".

13.     On September 29, 2011, Dr. Arguelles applied to the State Board for an order modifying the April 2011 Order (the "September 2011 Application"). Pursuant to the September 2011 Application, Dr. Arguelles waived any right to contest the April 2011 Order, agreed to limit her practice to treating her pre-existing patients, and agreed to surrender her medical license in one month, on October 31, 2011. In exchange, Dr. Arguelles asked the State Board to delete the $10,000.00 fine, the five-year probationary period, and the probationary restrictions on her medical license from the April 2011 Order. By Order dated October 5, 2011 (the "October 2011 Order"), the State Board modified the April 2011 Order as requested by Dr. Arguelles in the September 2011 Application. A copy of the October 2011 Order, incorporating the September 2011 Application, is annexed hereto as Exhibit "4".

14.     In accordance with the October 2011 Order, Dr. Arguelles surrendered her medical license on October 31, 2011.

**B.     The PC Defendants**

15.     Defendant Vincent PC is a New York medical professional corporation with its principal place of business in New York. Vincent PC was fraudulently incorporated in New York

on or about July 26, 2004, nominally has been owned on paper by Dr. Arguelles, but in actuality always has been owned and controlled by Soltanov in contravention of New York law.

16.     Defendant Arguelles PC is a New York medical professional corporation with its principal place of business in New York. Arguelles PC was fraudulently incorporated in New York on or about July 31, 2006, nominally has been owned on paper by Dr. Arguelles, but in actuality always has been owned and controlled by Soltanov in contravention of New York law.

**C.    Soltanov**

17.     Defendant Soltanov resides in and is a citizen of New York. Soltanov never has been a licensed physician, yet has owned, controlled, and derived economic benefit from the PC Defendants in contravention of New York law.

<u>**JURISDICTION AND VENUE**</u>

18.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. § 1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. §§ 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States. In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

19.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.    **An Overview of the No-Fault Laws and Licensing Statutes**

20.    GEICO underwrites automobile insurance in the State of New York.

21.    New York's no-fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the health care services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.) (collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

22.    No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for healthcare goods and services, including physician services.

23.    An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services. Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

24.    Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they are unlawfully incorporated or fail to meet any New York State or local licensing requirements necessary to provide the underlying services. In New York, only a licensed physician may: (i) practice medicine; (ii) own and control a professional

7

corporation authorized to operate a medical practice; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services. Unlicensed individuals may not: (i) practice medicine; (ii) own or control a professional corporation authorized to operate a medical practice; (iii) employ or supervise physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

25.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York … .

26.     Therefore, under the No-Fault Laws, a medical professional corporation is not eligible to receive No-Fault Benefits if it is fraudulently incorporated, fraudulently licensed, or if it engages in unlawful fee-splitting with non-physicians. Likewise, under the No-Fault Laws a physician is not eligible to receive No-Fault Benefits if she engages in unlawful fee-splitting with non-physicians, which is prohibited by, inter alia, New York's Education Law.

27.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals confirmed that healthcare providers that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

28.     Pursuant to the No-Fault Laws, only healthcare services providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the

patient or his/her healthcare services provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits <u>directly</u> to providers of healthcare services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

29.    Accordingly, for a healthcare provider to be eligible to bill for and to collect charges from an insurer for healthcare services pursuant to Insurance Law § 5102(a), it must be the actual provider of the service. Under the No-Fault Laws, a medical professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

30.    Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 Forms submitted by a healthcare provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.    <u>The Fraudulent Incorporation and Operation of the PC Defendants</u>

31.    Beginning in 2004, and continuing through the present day, the Defendants masterminded and implemented a complex fraudulent scheme in which the PC Defendants – two medical professional corporations nominally owned on paper by Dr. Arguelles, but actually illegally owned and controlled by a non-physician – have been used to bill the New York automobile insurance industry millions of dollars that they never were eligible to receive.

A.     **The Fraudulent Incorporation and Operation of Vincent PC**

32.     In early 2004, Soltanov commenced a search for a licensed physician who would be willing to sell the use of her medical license to him so that he could fraudulently incorporate a medical professional corporation and use it to submit large-scale fraudulent no-fault billing to insurers.

33.     In mid-2004, Soltanov recruited Dr. Arguelles, a licensed physician who was willing to sell the use of her medical license to Soltanov so that he could fraudulently incorporate Vincent PC.

34.     Dr. Arguelles was receptive to Soltanov's offer to serve as the front for the Defendants' unlawful scheme, inasmuch as she had attended medical school in the Philippines in the early 1950s, failed to obtain a medical license in the United States for three decades after she immigrated to this country, never achieved board certification in any medical specialty, was in her mid-70s, and her prospects for highly-remunerative medical employment therefore were limited.

35.     In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Vincent PC to operate a medical practice, Soltanov entered into a secret scheme with Dr. Arguelles. In exchange for a designated salary or other form of compensation, in mid-2004 Dr. Arguelles agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Vincent PC and that she truly owned, controlled and practiced through the professional corporation.

36.     Once Vincent PC was fraudulently incorporated on about July 26, 2004, Dr. Arguelles ceded true beneficial ownership and control over the professional corporation to Soltanov.

37.    Soltanov – rather than Dr. Arguelles – provided all start-up costs and investment in Vincent PC. Dr. Arguelles did not incur any costs to establish Vincent PC's practice, nor did she invest any money in the professional corporation she purportedly owned.

38.    Thereafter, Soltanov caused Vincent PC to commence operations from the Flatbush Avenue Facility, which he controlled and from which he previously had operated other business entities, including a management company called PS Management Corp.

39.    Dr. Arguelles never has been the true shareholder, director, or officer of Vincent PC, and never has had any true ownership interest in or control over the professional corporation. True ownership and control over Vincent PC always has rested entirely with Soltanov, who has used the façade of Vincent PC to do indirectly what he is forbidden from doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

40.    Dr. Arguelles has exercised absolutely no control over or ownership interest in Vincent PC. All decision-making authority relating to the operation and management of Vincent PC has been vested entirely with Soltanov. In addition, Dr. Arguelles never has controlled or maintained any of Vincent PC's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of Vincent PC's financial affairs; never hired or supervised any of Vincent PC's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how Vincent PC has operated.

41.    For instance, during a June 30, 2011 and July 19, 2011 examination before trial, Dr. Arguelles gave testimony indicating that:

(i)    She did not know when Vincent PC opened for business.

(ii)    She did not know when Vincent PC closed.

(iii)   She did not know who incorporated Vincent PC.

(iv)    She did not know whether a medical practice existed at the Flatbush Avenue Facility before Vincent PC began operating from that location.

(v)     She did not know when Vincent PC commenced its lease at the Flatbush Avenue Facility.

(vi)    She could not recall the amount that Vincent PC paid as rent for the Flatbush Avenue Facility.

(vii)   She could not recall whether Vincent PC had a written lease for the Flatbush Avenue Facility.

(viii)  She could not recall Vincent PC's monthly overhead costs at the Flatbush Avenue Facility.

(ix)    She could not recall the names of the employees at Vincent PC, including the names of the physical therapists and technicians who purportedly performed healthcare services at Vincent PC.

(x)     She could not recall how much Vincent PC paid the physical therapists.

(xi)    She could not recall the names of the chiropractors who rented space from Vincent PC and operated from the Flatbush Avenue Facility alongside Vincent PC.

(xii)   She could not recall the amount of rent that the chiropractors paid to Vincent PC.

(xiii)  She did not know if Vincent PC's bank accounts were still open.

(xiv)   She could not recall how much profit Vincent PC generated.

(xv)    She could not recall where Vincent PC's checkbook was located.

(xvi)   Soltanov, though ostensibly employed by Vincent PC as Vincent PC's "biller", possessed knowledge about Vincent PC's operations, and control over those operations, that went far beyond that expected of a biller. For instance:

  a.   Soltanov knew how much the physical therapists at Vincent PC were paid, even though Dr. Arguelles did not know how much the physical therapists were paid.

  b.   Soltanov knew whether the Vincent PC bank accounts were still open, even though Dr. Arguelles did not know whether the Vincent PC bank accounts were still open.

    c.   Though neither Vincent PC nor Dr. Arguelles remained at the Flatbush Avenue Facility, Soltanov continued to operate from the Flatbush Avenue Facility.

    d.   Vincent PC's mail – including its bank statements – continued to be sent to the Flatbush Avenue Facility, from which Soltanov continued to operate, even though neither Vincent PC nor Dr. Arguelles remained at the Flatbush Avenue Facility.

    e.   Soltanov had access to the post office boxes listed as the billing addresses on the billing submitted through Vincent PC.

    f.   Soltanov decided what billing codes to use for the procedures that allegedly were performed through Vincent PC.

    g.   Though neither Dr. Arguelles nor Vincent PC continued to operate from the Flatbush Avenue Facility, Vincent PC's billing and patient files remained at the Flatbush Avenue Facility, from which Soltanov continued to operate.

    h.   Though Soltanov continued to handle Vincent PC's outstanding billing after the professional corporation ceased operations, Dr. Arguelles could not recall whether he received a salary for these services.

42.    The only thing that Dr. Arguelles actually has done during her tenure as the paper owner of Vincent PC under Soltanov's control has been to occasionally perform the Fraudulent Services. In reality, Dr. Arguelles has been nothing more than Soltanov's de facto employee.

43.    To conceal his true ownership and control of Vincent PC while simultaneously effectuating pervasive, total control over its operation and management, Soltanov arranged to have Dr. Arguelles and Vincent PC enter into a series of "management," "billing," "marketing," and "lease" agreements with himself. These agreements have called for exorbitant payments from Vincent PC to Soltanov, for the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of Vincent PC's business; or (ii) the income generated by the professional corporation.

44.    While these agreements ostensibly were created to permit Soltanov to provide "management," "billing," and "marketing," services, or facility space and equipment, they actually

have been used solely as a tool to permit Soltanov to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Vincent PC; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through Vincent PC.

45.    The net effect of these "management," "billing," "marketing," and "lease" agreements between Dr. Arguelles, Vincent PC, and Soltanov has been to maintain Vincent PC in a constant state of debt to Soltanov, thereby enabling Soltanov to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

46.    Not only has Soltanov siphoned Vincent PC's revenues to himself through "management," "billing," "marketing," and "lease" agreements, he also has caused Vincent PC to issue checks and wire transfers to pay his lavish personal lifestyle expenses. For instance, Soltanov has used insurance proceeds to pay hundreds of thousands of dollars worth of his personal credit card bills, home mortgages, and luxury automobile payments. Soltanov also caused Vincent PC to issue checks made out to "cash", then spent the cash on himself. For example:

(i)    Between 2004 and 2010, Soltanov caused Vincent PC to pay more than $1,150,000.00 in credit card charges for his personal purchases.

(ii)    Between 2004 and 2008, Soltanov caused Vincent PC to pay more than $160,000.00 in mortgage, renovation and decorating expenses for properties that he owned or controlled.

(iii)    Between 2005 and 2008, Soltanov caused Vincent PC to pay more than $70,000.00 for his personal luxury automobile payments.

(iv)    Between 2005 and 2009, Soltanov withdrew more than $58,000.00 in cash from the Vincent PC bank accounts, using either the Vincent PC debit card or by writing checks on the Vincent PC account made out to cash.

47.    In addition, between 2004 and 2010 Soltanov caused Vincent PC to make tens of thousands of dollars worth of additional payments for his personal lifestyle expenses, including

substantial payments to the Fontainebleu Hotel in Miami; substantial payments to the Oceana nightclub – a Brighton Beach facility; payments for law school and Bar-Bri tuition for Soltanov's business associates; payments for department store purchases; and mobile telephone expenses.

### B.    The Fraudulent Incorporation and Operation of Arguelles PC

48.    After unlawfully owning, controlling, and operating Vincent PC for two years, Soltanov grew concerned that the volume of fraudulent no-fault billing the Defendants were submitting through Vincent PC would draw attention to their fraudulent scheme.

49.    Accordingly, in early 2006 Soltanov decided to fraudulently incorporate a new professional corporation under a new tax identification number in order to reduce the volume of billing submitted through Vincent PC, avoid detection, and thereby perpetuate the Defendants' scheme.

50.    Toward that end, Soltanov once again approached Dr. Arguelles, and in early 2006 offered to purchase the use of her medical license so that he could fraudulently incorporate Arguelles PC.

51.    Simultaneously, Soltanov informed Dr. Arguelles that he intended to wind down operations at Vincent PC. Soltanov did not ask Dr. Arguelles' permission to wind down operations at Vincent PC, or consult with her in making his decision, in keeping with the fact that Soltanov is the true owner of Vincent PC, and Dr. Arguelles never has had any true ownership interest in or control over the professional corporation.

52.    In order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Vincent PC to operate a medical practice, Soltanov once again entered into a secret scheme with Dr. Arguelles. In exchange for a designated salary or other form of compensation, in mid-2006 Dr. Arguelles agreed to falsely represent in the

certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Arguelles PC and that she truly owned, controlled and practiced through the professional corporation.

53.    As was the case with Vincent PC, once Arguelles PC was fraudulently incorporated on about July 31, 2006, Dr. Arguelles ceded true beneficial ownership and control over the professional corporation to Soltanov.

54.    As at Vincent PC, Soltanov – rather than Dr. Arguelles – provided all start-up costs and investment in Arguelles PC. Dr. Arguelles did not incur any costs to establish Arguelles PC's practice, nor did she invest any money in the professional corporation she purportedly owned.

55.    Thereafter, Soltanov caused Arguelles PC to commence operations from the Flatbush Avenue Facility, in place of Vincent PC.

56.    As was the case with Vincent PC, Dr. Arguelles never has been the true shareholder, director, or officer of Arguelles PC, and never has had any true ownership interest in or control over the professional corporation. True ownership and control over Arguelles PC always has rested entirely with Soltanov, who has used the façade of Arguelles PC to do indirectly what he is forbidden from doing directly, namely: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

57.    As with Vincent PC, Dr. Arguelles has exercised absolutely no control over or ownership interest in Arguelles PC. All decision-making authority relating to the operation and management of Arguelles PC has been vested entirely with Soltanov. In addition, Dr. Arguelles never has controlled or maintained any of Arguelles PC's books or records, including its bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible

for handling any aspect of Arguelles PC's financial affairs; never hired or supervised any of Arguelles PC's employees or independent contractors; and has been completely unaware of the most fundamental aspects of how Arguelles PC has operated.

58.    For instance, during her June 30, 2011 and July 19, 2011 examination before trial, Dr. Arguelles gave testimony indicating that:

(i)      She did not know when Arguelles PC opened for business.

(ii)     She did not know when Arguelles PC closed.

(iii)    She did not know who incorporated Arguelles PC.

(iv)     She did not know when Arguelles PC commenced its lease at the Flatbush Avenue Facility.

(v)      She could not recall the amount that Arguelles PC paid as rent for the Flatbush Avenue Facility.

(vi)     She could not recall whether Arguelles PC had a written lease for the Flatbush Avenue Facility.

(vii)    She could not recall Arguelles PC's monthly overhead costs at the Flatbush Avenue Facility.

(viii)   She could not recall the names of the employees at Arguelles PC, including the names of the physical therapists and technicians who purportedly performed healthcare services at Arguelles PC.

(ix)     She could not recall how much Arguelles PC paid the physical therapists.

(x)      She could not recall the names of the chiropractors who rented space from Arguelles PC and operated from the Flatbush Avenue Facility alongside Arguelles PC.

(xi)     She could not recall the amount of rent that the chiropractors paid to Arguelles PC.

(xii)    She did not know if Arguelles PC's bank accounts were still open.

(xiii)   She could not recall how much profit Arguelles PC generated.

(xiv)    She could not recall where Arguelles PC's checkbook was located.

(xv)    Soltanov, though ostensibly employed by Arguelles PC as Arguelles PC's "biller", possessed knowledge about Arguelles PC's operations, and control over those operations, that went far beyond that expected of a biller. For instance:

a.  Soltanov knew how much the physical therapists at Arguelles PC were paid, even though Dr. Arguelles did not know how much the physical therapists were paid.

b.  Soltanov knew whether the Arguelles PC bank accounts were still open, even though Dr. Arguelles did not know whether the Arguelles PC bank accounts were still open.

c.  Though neither Arguelles PC nor Dr. Arguelles remained at the Flatbush Avenue Facility, Soltanov continued to operate from the Flatbush Avenue Facility.

d.  Arguelles PC's mail – including its bank statements – continued to be sent to the Flatbush Avenue Facility, from which Soltanov continued to operate, even though neither Arguelles PC nor Dr. Arguelles remained at the Flatbush Avenue Facility.

e.  Soltanov had access to the post office boxes listed as the billing addresses on the billing submitted through Arguelles PC.

f.  Soltanov decided what billing codes to use for the procedures that allegedly were performed through Arguelles PC.

g.  Though neither Dr. Arguelles nor Arguelles PC continued to operate from the Flatbush Avenue Facility, Arguelles PC's billing and patient files remained at the Flatbush Avenue Facility, from which Soltanov continued to operate.

h.  Though Soltanov continued to handle Arguelles PC's outstanding billing after the professional corporation ceased operations, Dr. Arguelles could not recall whether he received a salary for these services.

59.    As was the case at Vincent PC, the only thing that Dr. Arguelles actually has done during her tenure as the paper owner of Arguelles PC under Soltanov's control has been to occasionally perform the Fraudulent Services. In reality, Dr. Arguelles has been nothing more than Soltanov's de facto employee.

60.    As with Vincent PC, to conceal his true ownership and control of Arguelles PC while simultaneously effectuating pervasive, total control over its operation and management,

Soltanov arranged to have Dr. Arguelles and Arguelles PC enter into a series of "management," "billing," "marketing," and "lease" agreements with himself. These agreements have called for exorbitant payments from Arguelles PC to Soltanov, for the alleged performance of certain designated services including management, marketing, billing, and collections regardless of: (i) the volume of Arguelles PC's business; or (ii) the income generated by the professional corporation.

61. While these agreements ostensibly were created to permit Soltanov to provide "management," "billing," and "marketing," services, or facility space and equipment, they actually have been used solely as a tool to permit Soltanov to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own Arguelles PC; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through Arguelles PC.

62. The net effect of these "management," "billing," "marketing," and "lease" agreements between Dr. Arguelles, Arguelles PC, and Soltanov has been to maintain Arguelles PC in a constant state of debt to Soltanov, thereby enabling Soltanov to maintain total control over the professional corporation, its accounts receivable, and any revenues that might be generated therefrom.

63. Not only has Soltanov siphoned Arguelles PC's revenues to himself through "management," "billing," "marketing," and "lease" agreements, he also has caused Arguelles PC to issue checks and wire transfers to pay his lavish personal lifestyle expenses – as was the case with Vincent PC. For instance, Soltanov has used insurance proceeds to pay hundreds of thousands of dollars worth of his personal credit card bills, home mortgages, and luxury automobile payments. Soltanov also caused Arguelles PC to issue checks made out to "cash", then spent the cash on himself. For example:

(i) Between 2006 and 2011, Soltanov caused Arguelles PC to pay more than $1,500,000.00 in credit card charges for his personal purchases.

(ii)    Between 2006 and 2011, Soltanov caused Arguelles PC to pay more than $300,000.00 in mortgage, maintenance fee, property tax, renovation and decorating expenses for properties that he owned or controlled.

(iii)   Between 2006 and 2011, Soltanov caused Arguelles PC to pay more than $25,000.00 for his personal luxury automobile payments.

(iv)   Between 2006 and 2011, Soltanov withdrew more than $160,000.00 in cash from the Arguelles PC bank accounts, using either the Arguelles PC debit card or by writing checks on the Arguelles PC account made out to cash.

64.    In addition, between 2006 and 2011 Soltanov caused Arguelles PC to make tens of thousands of dollars worth of additional payments for his personal lifestyle expenses, including substantial payments to the Fontainebleu Hotel in Miami; payments for law school tuition for Soltanov's business associates; payments for department store purchases; and mobile telephone expenses.

65.    In an attempt to further reduce the volume of billing submitted through any one entity, avoid detection, and thereby perpetuate the scheme, Soltanov periodically caused billing for the Fraudulent Services to be submitted to GEICO in Dr. Arguelles' name, rather than in the name of one of the PC Defendants.

**C.    Soltanov's Termination of Dr. Arguelles and Wind-Down of Arguelles PC**

66.    In early 2009, after unlawfully owning and controlling Arguelles PC for two-and-a-half years, Soltanov grew concerned that the volume of fraudulent no-fault billing the Defendants were submitting through Arguelles PC would draw attention to their fraudulent scheme.

67.    Furthermore, Soltanov was concerned that Dr. Arguelles – who by that point was almost 80 years old – no longer was suitable for service as the nominal or "paper" owner of a fraudulently incorporated professional corporation.

68.    Accordingly, Soltanov informed Dr. Arguelles that he intended to wind operations down at Arguelles PC, terminate her as the nominal or "paper" owner of the professional corporation, and fraudulently incorporate a new professional corporation using a new physician to serve as the nominal or "paper" owner.

69.    Soltanov did not ask Dr. Arguelles' permission to wind down operations at Arguelles PC, or to fire her as the nominal or "paper" owner of the professional corporation, in keeping with the fact that Soltanov is the true owner of Arguelles PC, and Dr. Arguelles never was anything more than Soltanov's de facto, at-will employee.

70.    Thereafter, in late 2009, Soltanov caused Arguelles PC to cease operations from the Flatbush Avenue Facility and replaced Arguelles PC and Dr. Arguelles with a new entity, Compas Medical, P.C., and a new nominal or "paper" owner, Jean Compas, M.D.

71.    Though neither Arguelles PC nor Vincent PC operated from the Flatbush Avenue Facility once Compas Medical, P.C. replaced Arguelles PC at the Flatbush Avenue Facility in late 2009, Soltanov continued to maintain Arguelles PC's and Vincent PC's billing files and patient files at the Flatbush Avenue Facility, continued to receive their mail and bank records at the Flatbush Avenue Facility, and continued to list the Flatbush Avenue Facility as their address for service of process, so as to facilitate his continued unlawful ownership and control over the professional corporations, their accounts receivable, and any profits that might be generated therefrom.

72.    The ownership and control of the PC Defendants and Dr. Arguelles' medical practice by a non-physician compromises patient care, as the provision of health services by the PC Defendants and Dr. Arguelles has been subject to the pecuniary interests of a non-physician as opposed to the independent medical judgment of a true doctor-owner.

## III.   The Fraudulent Billing for Independent Contractor Services

73.     The Defendants' fraudulent scheme also has included submission of claims to GEICO seeking payment for services performed by independent contractors. Under the No-Fault Laws, professional service corporations are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees.

74.     Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that professional corporations are not entitled to receive reimbursement under the No-Fault Laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services"); DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-11-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals); See DOI Opinion Letter, March 21, 2005 (DOI refused to modify its earlier opinions based upon interpretations of the Medicare statute issued by the CMS) (copies of the relevant DOI Opinion letters are annexed hereto as Exhibit "5").

75.     Dr. Arguelles has been the only physician employed by the PC Defendants.

76.    The only service that Dr. Arguelles ever performed at the PC Defendants was to conduct basic medical examinations and make referrals.

77.    None of the physical therapists who performed services that were billed through the PC Defendants were employees of the PC Defendants.

78.    Even so, the Defendants routinely submitted charges to GEICO and other insurers on behalf of the PC Defendants for electrodiagnostic testing, physical therapy, and various types of pain management injections. None of these services were provided by Dr. Arguelles or by any physical therapist employed by the PC Defendants.

79.    Rather, all of the electrodiagnostic testing, physical therapy and pain management injections billed to GEICO through the PC Defendants have been performed – to the extent that they have been performed at all – by physicians, physical therapists, and technicians whom the Defendants treated as independent contractors.

80.    For instance, the Defendants:

(i)    paid the physicians, physical therapists, and technicians, either in whole or in part, on a 1099 basis rather than a W-2 basis;

(ii)    established an understanding with the physicians, physical therapists, and technicians that they were independent contractors, rather than employees;

(iii)    paid no employee benefits to the physicians, physical therapists, and technicians;

(iv)    failed to secure and maintain W-4 or I-9 forms for the physicians, physical therapists, and technicians;

(v)    failed to withhold federal, state or city taxes on behalf of the physicians, physical therapists, and technicians;

(vi)    compelled the physicians, physical therapists, and technicians to pay for their own malpractice insurance at their own expense;

(vii)    permitted the physicians, physical therapists, and technicians to set their own schedules and days on which they desired to perform services;

(viii)   permitted the physicians, physical therapists, and technicians to maintain non-exclusive relationships and perform services for their own practices and/or on behalf of other medical practices;

(ix)    failed to cover the physicians, physical therapists, and technicians for either unemployment or workers' compensation benefits; and

(x)     filed corporate and payroll tax returns (e.g. Internal Revenue Service ("IRS") forms 1120 and 941) that represented to the IRS and to the New York State Department of Taxation that the physicians, physical therapists, and technicians were independent contractors.

81.    By electing to treat the physicians, physical therapists, and technicians as independent contractors, the Defendants realize significant economic benefits – for instance:

(i)    avoiding the obligation to collect and remit income tax as required by 26 U.S.C. § 3102;

(ii)   avoiding payment of the FUTA excise tax required by 26 U.S.C. § 3301 (6.2 percent of all income paid);

(iii)  avoiding payment of the FICA excise tax required by 26 U.S.C. § 3111 (7.65 percent of all income paid);

(iv)   avoiding payment of workers' compensation insurance as required by New York Workers' Compensation Law § 10;

(v)    avoiding the need to secure any malpractice insurance; and

(vi)   avoiding claims of agency-based liability arising from work performed by the physicians, physical therapists, and technicians.

82.    Because the physicians, physical therapists, and technicians were independent contractors and performed the electrodiagnostic testing, physical therapy and pain management injections, the PC Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services.

83.    The Defendants billed for the electrodiagnostic testing, physical therapy and pain management injections as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement. The Defendants'

misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not.

84.    In some cases, the Defendants attempted to conceal the fact that the electrodiagnostic testing, physical therapy and pain management injections were performed by independent contractors by falsely listing Dr. Arguelles on the billing as the treating provider.

85.    For example, Dr. Arguelles purported to provide physical therapy to an Insured named "Patient One" at the Flatbush Avenue Facility on July 28, 2009 and August 10, 2009. A copy of the billing submitted to GEICO through Arguelles PC for the services is annexed hereto as Exhibit "6".

86.    However, on those same dates – July 28, 2009 and August 10, 2009 – Dr. Arguelles also purported to treat an Insured named "Patient Two" at a no-fault clinic in North Miami, Florida. A copy of the billing submitted to GEICO through the Florida no-fault clinic is annexed hereto as Exhibit "7".

**IV.    The Defendants' Submission of Fraudulent NF-3 and HCFA-1500 Forms to GEICO**

87.    To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 forms and HCFA-1500 forms) consistently have been submitted to GEICO by and on behalf of the Defendants seeking payment for services for which the PC Defendants are ineligible to receive payment.

88.    The NF-3 forms and HCFA-1500 forms submitted to GEICO by and on behalf of the Defendants are false and misleading in the following material respects:

(i)    The NF-3 forms and HCFA-1500 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). In fact, the PC Defendants are not properly licensed in that they are medical professional corporations that were fraudulently incorporated and have been owned and controlled by Soltanov, who is not a licensed physician.

(ii)    The NF-3 forms and HCFA-1500 forms uniformly misrepresent to GEICO that the PC Defendants and Dr. Arguelles are in compliance with all material licensing laws and, therefore, are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the PC Defendants and Dr. Arguelles are not in compliance with all material licensing laws in that they engage in unlawful fee-splitting with Soltanov, who is not a licensed physician.

(iii)    With the exception of some NF-3 forms and HCFA-1500 forms covering basic medical examinations allegedly provided by Dr. Arguelles, the NF-3 forms and HCFA-1500 forms uniformly misrepresent to GEICO that the PC Defendants are eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 for the services that were performed. In fact, the PC Defendants are not eligible to seek or pursue collection of No-Fault Benefits associated with services other than basic medical examinations alleged to have been provided by Dr. Arguelles because the services were not provided by the PC Defendants' employees.

## V.    The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

89.    The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to GEICO.

90.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this concealment.

91.    Specifically, they knowingly have misrepresented and concealed facts related to the PC Defendants and Dr. Arguelles in an effort to prevent discovery that the professional corporations are unlawfully incorporated, owned and controlled by a non-physician and that the PC Defendants and Dr. Arguelles engage in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits. For example, the Defendants misrepresented Dr. Arguelles' ownership of and control over the PC Defendants in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit medicine to be practiced through the PC Defendants. Additionally, the

Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal Soltanov's true ownership of and control over the PC Defendants and fee splitting with Dr. Arguelles and the PC Defendants.

92.    Likewise, in every verified bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that the PC Defendants properly were incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

93.    In addition, the Defendants have knowingly misrepresented and concealed facts related to the employment status of the physicians, physical therapists, and technicians associated with the PC Defendants in order to prevent GEICO from discovering that the physicians, physical therapists, and technicians performing many of the Fraudulent Services – to the extent that they are performed at all – are not employed by the PC Defendants. In some cases, the Defendants actually have misrepresented the identity of the individual performing the Fraudulent Services, in order to conceal the fact that the services were performed by independent contractors.

94.    What is more, the Defendants have created multiple professional corporations with different tax identification numbers, and at times have filled for the Fraudulent Services under Dr. Arguelles' name, in order to reduce the amount of billing submitted through any single professional corporation, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity.

95.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

96.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days.    The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1,050,000.00 based upon the fraudulent charges.

97.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## FIRST CAUSE OF ACTION
### Against the PC Defendants and Dr. Arguelles
### (Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)

98.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 97 above.

99.    There is an actual case in controversy between GEICO, the PC Defendants , and Dr. Arguelles regarding more than $1,396,000.00 in fraudulent billing for the Fraudulent Services that has been submitted to GEICO.

100.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO because they are fraudulently incorporated and are owned and controlled by Soltanov, who is not a licensed physician, and, therefore, are ineligible to seek or recover No-Fault Benefits.

101.    The PC Defendants and Dr. Arguelles have no right to receive payment for any pending bills submitted to GEICO because they engaged in unlawful fee-splitting with Soltanov, who is not a licensed physician.

102.    The PC Defendants have no right to receive payment for any pending bills submitted to GEICO that seek payment for any services other than some of the basic physical examinations allegedly performed by Dr. Arguelles, because the billed-for services were performed by independent contractors, rather than by the PC Defendants' employees.

103.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     Vincent Medical Services, P.C. and Arguelles M.D., P.C. have no right to receive payment for any pending bills submitted to GEICO because they are fraudulently incorporated, owned and controlled by a non-physician and, therefore, are ineligible to recover No-Fault Benefits;

(iv)    Dr. Arguelles, Vincent Medical Services, P.C. and Arguelles M.D., P.C. have no right to receive payment for any pending bills submitted to GEICO because they engage in unlawful fee splitting with a non-physician and, therefore, are ineligible to recover No-Fault Benefits; and

(v)     in many cases, Vincent Medical Services, P.C. and Arguelles M.D., P.C. have no right to receive payment for pending bills submitted to GEICO because the Fraudulent Services – to the extent that they are performed at all – have been performed by independent contractors, rather than by the PC Defendants' employees.

### SECOND CAUSE OF ACTION
**Against Soltanov and Dr. Arguelles**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

104.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 103 above.

105.    Vincent Medical Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

106.    Soltanov and Dr. Arguelles knowingly have conducted and/or participated, directly or indirectly, in the conduct of Vincent PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the

use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over three-and-a-half years seeking payments that Vincent PC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engaged in fee-splitting with a non-physician; and (iii) it billed for services performed by independent contractors. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

107. Vincent PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Soltanov and Dr. Arguelles operate Vincent PC, insofar as Vincent PC never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Vincent PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Vincent PC to the present day.

108. Vincent PC is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by a non-physician, and its existence therefore has depended on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Vincent PC likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently

unlawful acts are taken by Vincent PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

109.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $271,000.00 pursuant to the fraudulent bills submitted by the Defendants through Vincent PC.

110.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### THIRD CAUSE OF ACTION
**Against Soltanov and Dr. Arguelles**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

111.   GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 110 above.

112.   Vincent Medical Services, P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

113.   Soltanov and Dr. Arguelles are employed by and/or associated with the Vincent PC enterprise.

114.   Soltanov and Dr. Arguelles knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Vincent PC enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Vincent PC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engaged in fee-splitting with a non-physician; and (iii) it

31

billed for services performed by independent contractors. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

115.    Soltanov and Dr. Arguelles knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

116.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $271,000.00 pursuant to the fraudulent bills submitted by the Defendants through Vincent PC.

117.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Vincent PC, Soltanov, and Dr. Arguelles
### (Common Law Fraud)

118.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 117 above.

119.    Vincent PC, Soltanov, and Dr. Arguelles intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

120.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Vincent PC is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by a non-physician; (ii) in every claim, the representation that Vincent PC is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engages in illegal fee-splitting with a non-physician; (iii) in every claim other than claims for basic physical examinations allegedly performed by Dr. Arguelles, the representation that Vincent PC was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed, when in fact it was not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by Vincent PC's employees.

121.    Vincent PC, Soltanov, and Dr. Arguelles intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Vincent PC that were not compensable under the No-Fault Laws.

122.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $271,000.00 pursuant to the fraudulent bills submitted by the Defendants through Vincent PC.

123.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

124.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FIFTH CAUSE OF ACTION
### Against Vincent PC, Soltanov, and Dr. Arguelles
### (Unjust Enrichment)

125.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 124 above.

126.    As set forth above, Vincent PC, Soltanov, and Dr. Arguelles have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

127.    When GEICO paid the bills and charges submitted by or on behalf of Vincent PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

128.    Vincent PC, Soltanov, and Dr. Arguelles have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

129.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

130.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $271,000.00.

## SIXTH CAUSE OF ACTION
### Against Soltanov and Dr. Arguelles
### (Violation of RICO, 18 U.S.C. § 1962(c))

131.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 130 above.

132.    Arguelles M.D., P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

133.    Soltanov and Dr. Arguelles knowingly have conducted and/or participated, directly or indirectly, in the conduct of Arguelles PC's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years seeking payments that Arguelles PC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engaged in fee-splitting with a non-physician; and (iii) it billed for services performed by independent contractors. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

134.    Arguelles PC's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Soltanov and Dr. Arguelles operate Arguelles PC, insofar as Arguelles PC never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Arguelles PC to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Arguelles PC to the present day.

135.    Arguelles PC is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled

by a non-physician, and its existence therefore has depended on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Arguelles PC likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Arguelles PC in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

136.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $781,000.00 pursuant to the fraudulent bills submitted by the Defendants through Arguelles PC.

137.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### SEVENTH CAUSE OF ACTION
**Against Soltanov and Dr. Arguelles**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

138.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 137 above.

139.    Arguelles M.D., P.C. is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

140.    Soltanov and Dr. Arguelles are employed by and/or associated with the Arguelles PC enterprise.

141.    Soltanov and Dr. Arguelles knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Arguelles PC enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal

mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Arguelles PC was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by a non-physician; (ii) it engaged in fee-splitting with a non-physician; and (iii) it billed for services performed by independent contractors. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2". Each such mailing was made in furtherance of the mail fraud scheme.

142.    Soltanov and Dr. Arguelles knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

143.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $781,000.00 pursuant to the fraudulent bills submitted by the Defendants through Arguelles PC.

144.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**EIGHTH CAUSE OF ACTION**
**Against Arguelles PC, Soltanov, and Dr. Arguelles**
**(Common Law Fraud)**

145.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 144 above.

146.    Arguelles PC, Soltanov, and Dr. Arguelles intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment for the Fraudulent Services.

147.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that Arguelles PC is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact it is fraudulently incorporated and actually owned and controlled by a non-physician; (ii) in every claim, the representation that Arguelles PC is properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 NYCRR § 65-3.16(a)(12), when in fact the professional corporation engages in illegal fee-splitting with a non-physician; (iii) in every claim other than claims for basic physical examinations allegedly performed by Dr. Arguelles, the representation that Arguelles PC was eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11(a) for the services that allegedly were performed, when in fact it was not eligible to seek or pursue collection of No-Fault Benefits associated with the services because the services were not provided by Arguelles PC's employees.

148.    Arguelles PC, Soltanov, and Dr. Arguelles intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through Arguelles PC that were not compensable under the No-Fault Laws.

149.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $781,000.00 pursuant to the fraudulent bills submitted by the Defendants through Arguelles PC.

150.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

151.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Arguelles PC, Soltanov, and Dr. Arguelles
### (Unjust Enrichment)

152.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 151 above.

153.    As set forth above, Arguelles PC, Soltanov, and Dr. Arguelles have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

154.    When GEICO paid the bills and charges submitted by or on behalf of Arguelles PC for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants' improper, unlawful, and/or unjust acts.

155.    Arguelles PC, Soltanov, and Dr. Arguelles have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

156.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

157.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $781,000.00.

### JURY DEMAND

158.    Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company and GEICO Casualty Co. demand that a Judgment be entered in their favor, as follows:

A.  On the First Cause of Action, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the PC Defendants and Dr. Arguelles have no right to receive payment for any pending bills submitted to GEICO;

B.  On the Second Cause of Action against Soltanov and Dr. Arguelles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $271,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.  On the Third Cause of Action against Soltanov and Dr. Arguelles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $271,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.  On the Fourth Cause of Action against Vincent PC, Soltanov, and Dr. Arguelles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $271,000.00,  together with punitive damages, costs, and interest;

E.  On the Fifth Cause of Action against Vincent PC, Soltanov, and Dr. Arguelles, more than $271,000.00 in compensatory damages, plus costs and interest;

F.  On the Sixth Cause of Action against Soltanov and Dr. Arguelles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $781,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.  On the Seventh Cause of Action against Soltanov and Dr. Arguelles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $781,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.  On the Eighth Cause of Action against Arguelles PC, Soltanov, and Dr. Arguelles, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $781,000.00, together with punitive damages, costs, and interest;

I.  On the Ninth Cause of Action against Arguelles PC, Soltanov, and Dr. Arguelles, more than $781,000.00 in compensatory damages, plus costs and interest; and

J.  For such other and further relief as to the Court may seem just and proper.

Dated: April 20, 2012

RIVKIN RADLER LLP

By:_____
        Barry I. Levy (BL 2190)
        Max Gershenoff (MG 4648)
926 RXR Plaza
Uniondale, New York  11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co, GEICO General Insurance Company  and GEICO Casualty Co.*