UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE CO.,
GEICO INDEMNITY CO., GEICO
GENERAL INSURANCE  COMPANY and
GEICO CASUALTY CO.,

                     Plaintiffs,

          -against-

ZENAIDA REYES-ARGUELLES, M.D.,

          -and-

ARGUELLES M.D., P.C.,
VINCENT MEDICAL SERVICES, P.C.,

          -and-

PAVEL SOLTANOV a/k/a PAUL SOLTANOV a/k/a
PAUL DADA,

                   Defendants.

------------------------------------------------------------------------X

Docket No. CV 12-1953
(CBA)(RLM)

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

          Respectfully submitted,

          RIVKIN RADLER LLP
          926 RXR Plaza
          Uniondale, New York 11556
          (516) 357-3000

          *Counsel for Plaintiffs, Government Employees*
          *Insurance Co., GEICO Indemnity Co., GEICO*
          *General Insurance Company and GEICO Casualty*
          *Co.*

Of Counsel:

Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES .................................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................. 1

STATEMENT OF FACTS ...................................................................................................... 2

I.     The Fraudulent Incorporation and Operation of the PC Defendants ................................ 2

II.    The Defendants' Charges for Independent Contractor Services.......................................... 6

III.   The Defendants' Fraudulent Billing ............................................................................... 7

IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance ................. 8

V.    The Defendants' Conduct Jeopardized Public Health and
Resulted in Arguelles Surrendering Her Medical License .............................................. 10

ARGUMENT ......................................................................................................................... 11

I.     The Standards on This Motion........................................................................................ 11

II.    The Relevant Regulatory Framework and the Mallela Decision...................................... 12

III.   GEICO's Civil RICO Claims are Sufficiently Pleaded .................................................... 14

     A.    GEICO Sufficiently Has Alleged Arguelles' Participation
in the PC Defendant/RICO Enterprises ................................................................. 15

     B.    GEICO Sufficiently Has Alleged a Pattern of Racketeering Activity................. 22

          1.    GEICO Sufficiently Has Alleged a Closed-Ended
Pattern of Racketeering Activity................................................................. 22

          2.    GEICO Sufficiently Has Alleged an Open-Ended
Pattern of Racketeering Activity................................................................. 24

          3.    GEICO's RICO Claims are Not Based Solely on Allegations
of Fraudulent Incorporation and Do Not Allege a Single
Victim – and, in Any Case, This Court Has Sustained
Similar RICO Claims Under Analogous Circumstances........................... 28

     C.    Because GEICO's Substantive RICO Claims are Not Subject
to Dismissal, its RICO Conspiracy Claims Likewise Should
Not Be Dismissed ................................................................................................. 30

IV.   GEICO's Common Law Fraud and Unjust Enrichment Claims Are
Not Barred by Res Judicata or Collateral Estoppel ......................................................... 30

V.    The Defendants' Statute of Limitations Defense Should Not Be Resolved
on a Motion Pursuant to Rule 12(b)(6) ........................................................................... 31

VI.   GEICO's Declaratory Judgment Claim is Sufficiently Pleaded...................................... 34

VII.  GEICO's Declaratory Judgment Claim is Not Subject to Arbitration.............................. 36

       A.      New York State Law, Rather Than the FAA, Governs the
Arbitrability of GEICO's Declaratory Judgment Claim in This Action .............. 36

              1.     The FAA Applies Only to Privately Negotiated Contracts,
Not to Arbitration Clauses That are Imposed on the Parties
to a Contract by Operation of State Law ................................................... 38

              2.     The FAA Does Not Apply Because the Insurance Policies
at Issue Contain a New York Choice of Law Clause ................................. 40

       B.      GEICO's Declaratory Judgment Claim is Not Subject to Arbitration .................. 42

              1.     Under New York Law, the Defendants Have Waived any
Right to Arbitrate GEICO's Declaratory Judgment Claim ....................... 42

              2.     Under New York Law, Considerations of Judicial Economy
and the Risk of Inconsistent Results Militate Against Arbitration
of GEICO's Declaratory Judgment Claim ................................................ 44

              3.     Even if the Court Were to Apply the FAA to the Present Motion, Plaintiffs
Can Show the Prejudice Necessary Under the FAA to
Establish That the Defendants Have Waived any Right to Compel
Arbitration ................................................................................................ 46

VIII.   To the Extent That the Court Finds a Defect, GEICO Requests Leave to Replead ......... 50

CONCLUSION ............................................................................................................................ 51

# TABLE OF AUTHORITIES

**Page(s)**

<small>**CASES**</small>

Agamede Ltd. v. Life Energy & Tech. Holdings, Inc.,
   2007 U.S. Dist. LEXIS 4698 (E.D.N.Y. 2007) ........................................................................35

AIU Ins. Co. v. Deajess Med. Imaging, P.C.,
   24 Misc. 3d 161 (Sup. Ct. Nassau Cty. 2009) ........................................................................46

AIU Ins. Co. v. Olmecs Med. Supply, Inc.,
   2005 U.S. Dist. LEXIS 29666 (E.D.N.Y. 2005) ................................................................16, 21

Allstate Ins. Co. v. Bogoraz,
   818 F. Supp. 2d 544 (E.D.N.Y. 2011)........................................................................18, 19, 20

Allstate Ins. Co. v. Halima,
   2009 U.S. Dist. LEXIS 22443 (E.D.N.Y. 2009) .....................................................................34

Allstate Ins. Co. v. Lyons,
   843 F. Supp. 2d 358 (E.D.N.Y. 2012).............................................................................. passim

Allstate Ins. Co. v. Rozenberg,
   590 F. Supp. 2d 384 (E.D.N.Y. 2008).....................................................................................21

Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C.,
   2009 U.S. Dist. LEXIS 91291 (E.D.N.Y. 2009) .............................................................. passim

Anderson News, L.L.C. v. Am. Media, Inc.,
   732 F. Supp. 2d 389 (S.D.N.Y. 2010)......................................................................................34

Ashcroft v. Iqbal,
   129 S. Ct. 1937 (2009) ............................................................................................................11

Autoone Ins. Co. v. Manhattan Heights Med., P.C.,
   2009 NY Slip Op 51663U (Sup. Ct. Nassau Cty. 2009)...........................................................46

Azrielli v. Cohen Law Offices,
   21 F.3d 512 (2d Cir. 1994) ......................................................................................................27

Beauford v. Helmsley,
   865 F.2d 1386 (2d Cir. 1989) ..................................................................................................27

Bell Atlantic Corp. v. Twombly,
   550 U.S. 544 (2007)..................................................................................................................11

Bernheim v. Litt,
   79 F.3d 318 (2d Cir. 1996) ......................................................................................................35

Brody v. Brody,
  2009 U.S. Dist. LEXIS 17078 (S.D.N.Y. 2009).........................................................................33

Brookridge Funding Corp. v. Northwestern Human Res., Inc.,
  170 Fed. Appx. 170 (2d Cir. 2006) ...........................................................................................49

Cardinal Chem. Co. v. Morton Int'l, Inc.,
  508 U.S. 83 (1993)....................................................................................................................36

Chubb & Son Inc. v. Kelleher,
  2010 U.S. Dist. LEXIS 141842 (E.D.N.Y. 2010).......................................................................23

Cleveland v. Caplaw Enters.,
  448 F.3d 518 (2d Cir. 2006) .......................................................................................................2

Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc.,
  187 F.3d 229 (2d Cir. 1999) .....................................................................................................22

Com-Tech Assoc. v. Computer Assoc. Int'l, Inc.,
  753 F.Supp. 1078 (E.D.N.Y 1990) ............................................................................................44

Com-Tech Assocs. v. Computer Assocs. Int'l,
  938 F.2d 1574 (2d Cir. 1991) ....................................................................................................48

Cortez v. Countrywide Ins. Co.,
  17 A.D.3d 508 (2d Dept. 2005) .................................................................................................43

De Falco v. Bernas,
  244 F.3d 286 (2d Cir. 2001) ...............................................................................................15, 24

Digitronics Inventioneering Corp. v. Jameson,
  52 A.D.3d 1099 (3d Dep't 2008)...............................................................................................43

Flagg v. Skadden, Arps, Slate, Meagher & Flom Pension Plan,
  2008 U.S. Dist. LEXIS 47613 (S.D.N.Y. 2008)........................................................................33

FragranceNet.com, Inc. v. FragranceX.com, Inc.,
  679 F. Supp. 2d 312 (E.D.N.Y. 2010)........................................................................................11

Friedman v. Schwartz,
  2009 U.S. Dist. LEXIS 20249 (E.D.N.Y. 2009) ........................................................................12

G-I Holdings v. Baron & Budd,
  238 F. Supp. 2d 521 (S.D.N.Y. 2002).................................................................................24, 26

GEICO Ins. Co. v. Williams,
  2011 NY Slip Op 30326U (Sup. Ct. Nassau Cty. 20011)..........................................................45

iv

Globaltex Group, Ltd. v. Trends Sportswear, Ltd.,
  2009 WL 1270002 (E.D.N.Y. 2009)............................................................................................33

Gov't Emples. Ins. Co. v. Damien,
  2011 U.S. Dist. LEXIS 138365 (E.D.N.Y. 2011).................................................................29, 46

Gov't Emples. Ins. Co. v. Grand Med. Supply, Inc.,
  2012 U.S. Dist. LEXIS 92469 (E.D.N.Y. 2012) ...........................................................40, 47, 50

Gov't Emples. Ins. Co. v. Hollis Med. Care, P.C.,
  2011 U.S. Dist. LEXIS 130721 (E.D.N.Y. 2011)...................................................14, 15, 22, 30

Granite Rock Co. v. Int'l Bhd. of Teamsters,
  130 S.Ct. 2847 (2010) ............................................................................................................38, 39

H.J. Inc. v. Northwestern Bell Tel. Co.,
  492 U.S. 229 (1989).......................................................................................................................22

In re S & R Co. of Kingston v. Latona Trucking, Inc.,
  159 F.3d 80 (2d Cir. 1998) .....................................................................................................48, 49

Lavian v. Haghnazari,
  884 F. Supp. 670 (E.D.N.Y. 1995) ..............................................................................................24

Leadertex v. Morganton Dyeing & Finishing Corp.,
  67 F.3d 20 (2d Cir. 1995) ..............................................................................................................48

Liberty Mut. Ins. Co. v. Blessinger,
  2007 U.S. Dist. LEXIS 21781 (E.D.N.Y. 2007) .........................................................................24

Liberty Mut. Ins. Co. v. Excel Imaging, P.C.,
  2012 U.S. Dist. LEXIS 86303 (E.D.N.Y. 2012) ............................................................... passim

M.N.H. Exps. v. B.A.T. Wear, Inc.,
  2006 U.S. Dist. LEXIS 50754 (E.D.N.Y. 2006) .........................................................................12

Mandarino v. Mandarino,
  180 Fed. Appx. 258 (2d Cir. 2006) ..............................................................................................33

Manos v. Geissler,
  321 F. Supp. 2d 588 (S.D.N.Y. 2004)..........................................................................................49

Matter of Waldman v Mosdos Bobov, Inc.,
  72 A.D.3d 983 (2d Dep't 2011)....................................................................................................44

Metro. Transp. Auth. v. Contini,
  2005 WL 1565524 (E.D.N.Y. 2005).............................................................................................25

Min Jin v. Metropolitan Life Ins. Co.,
    2000 U.S. App. LEXIS 16246 (2d Cir. 2000) ...........................................................................48

Moss v. Morgan Stanley, Inc.,
    719 F.2d 5 (2d Cir.1983) ........................................................................................................14

Motorola Credit Corp. v. Uzan,
    388 F.3d 39 (2d Cir. 2004) .....................................................................................................42

Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. NCR Corp.,
    376 Fed. Appx. 70 (2d Cir. 2010) .....................................................................................48, 49

New York v. Oneida Indian Nation,
    90 F.3d 58 (2d Cir. 1996) .......................................................................................................40

Oliver Schools, Inc. v. Foley,
    930 F.2d 248 (2d Cir.1991) ....................................................................................................50

Petrucelli v. Hasty,
    605 F. Supp. 2d 410 (E.D.N.Y. 2009).....................................................................................11

Protostorm, LLC v. Antonelli,
    2010 U.S. Dist. LEXIS 52618 (E.D.N.Y. 2010) .....................................................................42

Rashed v. Astrue,
    2010 U.S. Dist. LEXIS 78148 (E.D.N.Y. 2010) .....................................................................34

Roggio v. Nationwide Mut. Ins. Co.,
    66 N.Y.2d 260 (1985) .............................................................................................................43

Safeco Ins. Co. of Ind. v. Morel,
    2009 NY Slip Op 32187U (Sup. Ct. Nassau Cty. 2009)..........................................................46

Sec. Ins. Co. of Hartford v. TIG Ins. Co.,
    360 F.3d 322 (2d Cir. 2004) ...................................................................................................42

Sharkey v. Quarantillo,
    541 F.3d 75 (2d Cir. 2008) .....................................................................................................11

Sherrill v. Grayco Builders, Inc.,
    64 N.Y.2d 261 (1985) .............................................................................................................44

SKS Constructors, Inc. v. Drinkwine,
    458 F. Supp. 2d 68 (E.D.N.Y. 2006)...................................................................................24, 26

State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C.,
    2007 U.S. Dist. LEXIS 74459 (E.D.N.Y. 2007) ...........................................................29, 31, 34

State Farm Mut. Auto. Ins. Co. v. Cohan,
 2009 U.S. Dist. LEXIS 125653 (E.D.N.Y. 2009)..................................................................15, 28

State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C.,
 2008 U.S. Dist. LEXIS 71156 (E.D.N.Y. 2008) ..........................................................................22

State Farm Mut. Auto. Ins. Co. v. Eastern Medical, P.C.,
 E.D.N.Y. Docket No. CV 05-3804 (ENV)(RML)................................................................ passim

State Farm Mut. Auto. Ins. Co. v. Grafman,
 655 F. Supp. 2d 212 (E.D.N.Y. 2009)...................................................................................14, 36

State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C.,
 589 F. Supp. 2d 221 (E.D.N.Y. 2008)...........................................................................................31

State Farm Mut. Auto. Ins. Co. v. Kalika,
 2006 U.S. Dist. LEXIS 97454 (E.D.N.Y. 2006) .............................................................24, 28, 34

State Farm Mut. Auto. Ins. Co. v. Mallela,
 4 N.Y.3d 313 (2005) ......................................................................................................1, 13, 14

State Farm Mut. Auto. Ins. Co. v. Rabiner,
 749 F. Supp. 2d 94 (E.D.N.Y. 2010).........................................................................14, 29, 34, 36

Thysen, Inc. v. Calypso Shipping Corp.,
 S.A., 310 F.3d 102 (2d Cir. 2002)...........................................................................................47, 48

Travelers Indem. Co. v. Liberty Med. Imaging Assocs., P.C.,
 2009 U.S. Dist. LEXIS 29596 (E.D.N.Y. 2009) ...................................................................34, 35

United Computer Capital Corp. v. Daidone,
 2005 WL 579565 (N.D.N.Y. 2005) ..............................................................................................27

Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co.,
 517 F.3d 104 (2d Cir. 2008) ...........................................................................................................2

Volt Info. Scis. v. Bd. of Trs.,
 489 U.S. 468 (1989)...........................................................................................................39, 41, 42

## PRELIMINARY STATEMENT

Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co. (collectively "Plaintiffs" or "GEICO") respectfully submit this memorandum of law in opposition to the motions by Defendants Zenaida Reyes-Arguelles, M.D. ("Arguelles"), Arguelles M.D., P.C. ("Arguelles PC"), Vincent Medical Services, P.C. ("Vincent PC"), and Pavel Soltanov a/k/a Paul Soltanov a/k/a Paul Dada ("Soltanov")(collectively the "Defendants") to dismiss Plaintiffs' Complaint pursuant to Fed. R. Civ. P. 12(b)(6) and 12(b)(3).[1]

For the most part, the Defendants' putative grounds for dismissal are – with some slight and entirely cosmetic variations – the exact same arguments that time and again have been raised, and rejected, by this Court. Otherwise, they advance little more than weak technical points that are counterintuitive on their face and do not stand up to serious scrutiny.

As set forth herein, in State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that physicians and professional corporations that fail to comply with licensing requirements are ineligible to collect no-fault benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law, for instance by engaging in the corporate practice of medicine or by illegally splitting fees with unlicensed laypeople. Considering that the Complaint – if accepted as true – alleges that Defendants submitted a massive amount of fraudulent billing to GEICO that misrepresented – among

---

[1] As the Court is aware, the Defendants have submitted two separate memoranda of law in support of their respective motions to dismiss, containing containing a total of 46 pages, as well as a separate declaration from counsel for Arguelles, Arguelles PC, and Vincent PC, introducing more than 30 pages of exhibits. In the interests of economy, GEICO is responding to both motions with this single memorandum of law, and respectfully requests that the Court consider it in its entirety. declaration from counsel for Arguelles, Arguelles PC, and Vincent PC, introducing more than 30 pages of exhibits. In the interests of economy, GEICO is responding to both motions with this single memorandum of law, and respectfully requests that the Court consider it in its entirety.

other things – their entitlement to bill for or to collect no-fault benefits in the first instance, GEICO's RICO and common law claims are sufficiently pleaded, and the Defendants' motions to dismiss should be denied.

## STATEMENT OF FACTS[2]

Non-physicians may not own, control, or derive economic benefit from a medical professional corporation. Complaint at ¶ 24. Nor can they employ or supervise physicians. Id.

Even so, beginning in 2004, and continuing through the present day, the Defendants have masterminded and implemented a massive fraudulent scheme through which they have billed GEICO more than $1,050,000.00 for healthcare services (i.e., initial and follow-up examinations, diagnostic testing, pain management injections, and physical therapy)(collectively the "Fraudulent Services") through Vincent PC and Arguelles PC (collectively the "PC Defendants"), which: (i) Soltanov, a layperson, illegally owns and controls; and (ii) are not eligible for payment under the New York no-fault laws for the charges that they billed and/or collected. Id. at ¶¶ 1, 4, 31, and passim.

## I.    The Fraudulent Incorporation and Operation of the PC Defendants

To accomplish this scheme, Soltanov recruited Arguelles, a licensed physician, and "purchased" her medical license in order to fraudulently incorporate the PC Defendants. Id. at ¶¶ 32-33, 48-50. Arguelles was receptive to Soltanov's offer to serve as the front for the Defendants' unlawful scheme, inasmuch as she had attended medical school in the Philippines in the early 1950s, failed to obtain a medical license in the United States for three decades after she immigrated to this

---

[2] As the Defendants move to dismiss pursuant to Rule 12(b)(6), this statement of facts is derived entirely from the Complaint in this action. Accordingly, the facts set forth herein must be accepted as true for purposes of this motion. See, e.g. Vietnam Ass'n for Victims of Agent Orange v. Dow Chemical Co., 517 F.3d 104 (2d Cir. 2008) (citation omitted); see also Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006).

country, never achieved board certification in any medical specialty, was in her mid-70s, and her prospects for highly-remunerative medical employment therefore were limited. Id. at ¶ 34.

In order to circumvent New York law and to induce the State Education Department to issue certificates of authority authorizing the PC Defendants to operate medical practices, Soltanov entered into a secret scheme with Dr. Arguelles. Id. at ¶¶ 35, 52. In exchange for a designated salary or other form of compensation, in mid-2004 Arguelles agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Vincent PC and that she truly owned, controlled and practiced through the professional corporation. Id. Then, in mid-2006, Arguelles once again agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Arguelles PC and that she truly owned, controlled and practiced through the professional corporation

Once the PC Defendants were fraudulently incorporated, Dr. Arguelles ceded true beneficial ownership and control over the professional corporations to Soltanov. Id. at ¶¶ 36, 53. Thereafter, Soltanov caused the PC Defendants to commence operations from a facility located at 1468 Flatbush Avenue, in Brooklyn New York, which Soltanov owned and controlled and from which he previously had operated other business entities. Id. at ¶ 38, 54.

Arguelles never has been the true shareholder, director, or officer of the PC Defendants, and never has had any true ownership interest in or control over the professional corporations. Id. at ¶¶ 39, 56. True ownership and control over the PC Defendants has rested at all times entirely with Soltanov, who has used the façade of the PC Defendants to do indirectly what he is forbidden from

3

doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services. Id.

Arguelles has exercised absolutely no control over or ownership interest in the PC Defendants. Id. at ¶¶ 40, 57. All decision-making authority relating to the operation and management of the PC Defendants has been vested entirely with Soltanov. Id. In addition, Arguelles never has controlled or maintained any of the PC Defendants' books or records, including their bank accounts; never selected, directed, and/or controlled any of the individuals or entities responsible for handling any aspect of the PC Defendants' financial affairs; never hired or supervised any of the PC Defendants' employees or independent contractors; and has been completely unaware of the most fundamental aspects of how the PC Defendants have operated. Id.

For instance, during a June 30, 2011 and July 19, 2011 examination before trial, Arguelles gave testimony indicating that she knew nothing about the PC Defendants' operations or finances. Id. at ¶¶ 41, 58. Concomitantly, Arguelles gave testimony indicating that Soltanov had all of the information regarding the PC Defendants' operations and was in complete control of the PC Defendants and their finances.

The only thing that Arguelles actually has done during her tenure as the paper owner of the PC Defendants under Soltanov's control has been to occasionally perform the Fraudulent Services. Id. at ¶¶ 42, 59. In reality, Arguelles has been nothing more than Soltanov's de facto employee. Id.

To conceal his true ownership and control of the PC Defendants while simultaneously effectuating pervasive, total control over their operation and management, Soltanov arranged to have Arguelles and the PC Defendants enter into a series of sham "management," "billing," "marketing," and "lease" agreements with himself. Id. at ¶¶ 43, 60. These agreements have called for exorbitant payments from Vincent PC to Soltanov, for the alleged performance of certain designated services

4

including management, marketing, billing, and collections regardless of: (i) the volume of Vincent PC's business; or (ii) the income generated by the professional corporation. Id.

While these agreements ostensibly were created to permit Soltanov to provide "management," "billing," and "marketing," services, or facility space and equipment, they actually have been used solely as a tool to permit Soltanov to: (i) control the day-to-day operations, exercise supervisory authority over, and illegally own the PC Defendants; and (ii) to siphon all of the profits that have been generated by the billings submitted to GEICO and other insurers through the PC Defendants. Id. at ¶¶ 44, 61.

Not only has Soltanov siphoned the PC Defendants' revenues to himself through "management," "billing," "marketing," and "lease" agreements, he also has caused the PC Defendants to issue checks and wire transfers to pay his lavish personal lifestyle expenses. Id. at ¶¶ 46, 63. For instance, Soltanov has used insurance proceeds to pay hundreds of thousands of dollars worth of his personal credit card bills, home mortgages, and luxury automobile payments. Id. Soltanov also caused the PC Defendants to issue checks made out to "cash", then spent the cash on himself. Id.

In early 2009, Soltanov grew concerned that the volume of fraudulent no-fault billing the Defendants were submitting would draw attention to their fraudulent scheme.   Id. at ¶ 66. Furthermore, Soltanov was concerned that Arguelles – who by that point was almost 80 years old – no longer was suitable for service as the nominal or "paper" owner of a fraudulently incorporated professional corporation. Id. at ¶ 67. Accordingly, Soltanov informed Arguelles that he intended to wind operations down at Arguelles PC (which had replaced Vincent PC), terminate her as the nominal or "paper" owner of the professional corporation, and fraudulently incorporate a new professional corporation using a new physician to serve as the nominal or "paper" owner. Id. at ¶ 68.

5

Thereafter, in late 2009, Soltanov caused Arguelles PC to cease operations from the Flatbush Avenue Facility and replaced Arguelles PC and Arguelles with a new entity, Compas Medical, P.C., and a new nominal or "paper" owner, Jean Compas, M.D. Id. at ¶ 70.

Though neither Arguelles PC nor Vincent PC operated from the Flatbush Avenue Facility once Compas Medical, P.C. replaced Arguelles PC at the Flatbush Avenue Facility in late 2009, Soltanov continued to maintain the PC Defendants' billing files and patient files at the Flatbush Avenue Facility, continued to receive their mail and bank records at the Flatbush Avenue Facility, and continued to list the Flatbush Avenue Facility as their address for service of process, so as to facilitate his continued unlawful ownership and control over the professional corporations, their accounts receivable, and any profits that might be generated therefrom. Id. at ¶ 71.

## II. The Defendants' Charges for Independent Contractor Services

Under the No-Fault Laws, professional service corporations are ineligible to bill or receive payment for goods or services provided by independent contractors – the healthcare services must be provided by the professional corporations, themselves, or by their employees. Id. at ¶¶ 73-74.

Arguelles has been the only physician employed by the PC Defendants. Id. at ¶ 75. The only service that Arguelles ever performed at the PC Defendants was to conduct basic medical examinations and make referrals. Id. at ¶ 76. None of the physical therapists who performed services that were billed through the PC Defendants were employees of the PC Defendants. Id. at ¶ 77.

Even so, the Defendants routinely submitted charges to GEICO and other insurers on behalf of the PC Defendants for electrodiagnostic testing, physical therapy, and various types of pain management injections. Id. at ¶ 78. None of these services were provided by Arguelles or by any physical therapist employed by the PC Defendants. Id. Rather, all of the electrodiagnostic testing, physical therapy and pain management injections billed to GEICO through the PC Defendants have

6

been performed – to the extent that they have been performed at all – by physicians, physical therapists, and technicians whom the Defendants treated as independent contractors. Id. at ¶¶ 79-81.

Because the physicians, physical therapists, and technicians were independent contractors and performed the electrodiagnostic testing, physical therapy and pain management injections, the PC Defendants never had any right to bill for or collect No-Fault Benefits in connection with those services. Id. at ¶ 82. The Defendants billed for the electrodiagnostic testing, physical therapy and pain management injections as if they were provided by actual employees of the PC Defendants to make it appear as if the services were eligible for reimbursement. The Defendants' misrepresentations were consciously designed to mislead GEICO into believing that it was obligated to pay for these services, when in fact GEICO was not. Id. at ¶ 83.[3]

## III.   The Defendants' Fraudulent Billing

To support the fraudulent charges, statutorily prescribed claim forms for no-fault benefits (i.e., NF-3 forms and HCFA-1500 forms) consistently have been submitted to GEICO by and on behalf of the Defendants seeking payment for services for which the PC Defendants are ineligible to receive payment. Id. at ¶ 87.

The NF-3 forms and HCFA-1500 forms submitted to GEICO by and on behalf of the Defendants are false and misleading in the following material respects:

(i)    The NF-3 forms and HCFA-1500 forms uniformly misrepresent to GEICO that the PC Defendants are lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the PC Defendants are not properly licensed in that they are

---

[3] In some cases, the Defendants attempted to conceal the fact that the electrodiagnostic testing, physical therapy and pain management injections were performed by independent contractors by falsely listing Arguelles on the billing as the treating provider. Id. at ¶ 84. For example, Arguelles purported to provide physical therapy to GEICO insured at the Flatbush Avenue Facility on July 28, 2009 and August 10, 2009. Id. at ¶ 85. However, on those same dates – July 28, 2009 and August 10, 2009 – Arguelles also purported to treat a different GEICO insured at a no-fault clinic in North Miami, Florida. Id. at ¶ 86.

> medical professional corporations that were fraudulently incorporated and have
> been owned and controlled by Soltanov, who is not a licensed physician.
>
> (ii)    The NF-3 forms and HCFA-1500 forms uniformly misrepresent to GEICO that
> the PC Defendants and Arguelles are in compliance with all material licensing
> laws and, therefore, are eligible to receive No-Fault Benefits pursuant to
> Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12).  In fact, the PC
> Defendants and Arguelles are not in compliance with all material licensing laws
> in that they engage in unlawful fee-splitting with Soltanov, who is not a licensed
> physician.
>
> (iii)   With the exception of some NF-3 forms and HCFA-1500 forms covering basic
> medical examinations allegedly provided by Arguelles, the NF-3 forms and
> HCFA-1500 forms uniformly misrepresent to GEICO that the PC Defendants are
> eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and
> 11 N.Y.C.R.R. § 65-3.11 for the services that were performed. In fact, the PC
> Defendants are not eligible to seek or pursue collection of No-Fault Benefits
> associated with services other than basic medical examinations alleged to have
> been provided by Arguelles because the services were not provided by the PC
> Defendants' employees.

Id. at ¶ 88.

## IV.   The Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, the

Defendants systemically have concealed their fraud and have gone to great lengths to accomplish this

concealment. Id. at ¶ 90.

Specifically, they knowingly have misrepresented and concealed facts related to the PC

Defendants and Arguelles in an effort to prevent discovery that the professional corporations are

unlawfully incorporated, owned and controlled by a non-physician and that the PC Defendants and

Arguelles engage in fee splitting, and therefore are ineligible to bill for or collect no-fault benefits. Id.

at ¶ 91. For example, the Defendants misrepresented Arguelles' ownership of and control over the

PC Defendants in filings with the New York State Department of Education, so as to induce the New

York State Department of Education to issue the licenses required to permit medicine to be practiced

through the PC Defendants. Id. Additionally, the Defendants entered into complex financial

8

arrangements with one another that were designed to, and did, conceal Soltanov's true ownership of and control over the PC Defendants and fee splitting with Arguelles and the PC Defendants. Id.

Likewise, in every verified bill that the Defendants submitted or caused to be submitted, the Defendants uniformly misrepresented that the PC Defendants properly were incorporated, lawfully licensed, and eligible to bill for and collect no-fault benefits, when in fact they were not. Id. at ¶ 92.

In addition, the Defendants have knowingly misrepresented and concealed facts related to the employment status of the physicians, physical therapists, and technicians associated with the PC Defendants in order to prevent GEICO from discovering that the physicians, physical therapists, and technicians performing many of the Fraudulent Services – to the extent that they are performed at all – are not employed by the PC Defendants. Id. at ¶ 93. In some cases, the Defendants actually have misrepresented the identity of the individual performing the Fraudulent Services, in order to conceal the fact that the services were performed by independent contractors. Id.

What is more, the Defendants have created multiple professional corporations with different tax identification numbers, and at times have filled for the Fraudulent Services under Arguelles' name, in order to reduce the amount of billing submitted through any single professional corporation, thereby preventing GEICO from identifying the pattern of fraudulent charges submitted through any one entity. Id. at ¶ 94.

The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full. Id. at ¶ 95. GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. Id. at ¶ 96. The facially-valid documents submitted to GEICO in support of the fraudulent charges at

9

issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. Id.

## V.      The Defendants' Conduct Jeopardized Public Health and Resulted in Arguelles Surrendering Her Medical License

In addition to defrauding GEICO and other insurers, the Defendants' conduct jeopardized public health. Specifically, in an April 13, 2011 Determination and Order (the "April 2011 Order"), the New York State Department of Health Board for Professional Medical Conduct (the "State Board") fined Arguelles $10,000.00, suspended her medical license for five years, stayed the suspension, placed Arguelles on probation for five years, and restricted Arguelles' practice during the probationary period to Veteran's Administration facilities and facilities operating pursuant to Article 28 of the New York Public Health Law. Id. at ¶ 10.

The State Board imposed the penalties in the April 2011 Order after determining, among other things, that Arguelles had committed 54 specifications of misconduct, including negligence on more than one occasion, incompetence on more than one occasion, gross negligence, gross incompetence, unwarranted tests and treatment, fraudulent practice, willfully making and filing false reports, failing to maintain patient records, and moral unfitness. Id. at ¶ 11.

In the April 2011 Order, the State Board noted that all of Arguelles' misconduct had been committed while purporting to treat no-fault insureds at the Flatbush Avenue Facility controlled by Soltanov from which the PC Defendants operated. Id. at ¶¶ 12, 38, 55.

On September 29, 2011, Arguelles applied to the State Board for an order modifying the April 2011 Order (the "September 2011 Application"). Id. at ¶ 13. Pursuant to the September 2011 Application, Arguelles waived any right to contest the April 2011 Order, agreed to limit her practice to treating her pre-existing patients, and agreed to surrender her medical license in one month, on October 31, 2011. Id. In exchange, Arguelles asked the State Board to delete the $10,000.00 fine, the

five-year probationary period, and the probationary restrictions on her medical license from the April 2011 Order. Id. By Order dated October 5, 2011, the State Board modified the April 2011 Order as requested by Dr. Arguelles in the September 2011 Application. Id. In accordance with the October 2011 Order, Dr. Arguelles surrendered her medical license on October 31, 2011. Id. at ¶ 14.

## ARGUMENT

### I.     The Standards on This Motion

Pursuant to Rule 12(b)(6), dismissal is appropriate if the plaintiff has failed to offer sufficient factual allegations to make the asserted claim plausible on its face. Sharkey v. Quarantillo, 541 F.3d 75, 92 (2d Cir. 2008). Thus, a court should not dismiss a complaint for failure to state a claim if the factual allegations sufficiently "raise a right to relief above the speculative level." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). This "plausibility" requirement does not mandate a universal standard of heightened fact pleading. Petrucelli v. Hasty, 605 F. Supp. 2d 410, 417 (E.D.N.Y. 2009). More recently, in Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), the Supreme Court provided further guidance, noting that "[d]etermining whether a complaint states a plausible claim for relief [is] . . . a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id. at 1950.

In this context, "[t]he court's function on a Rule 12(b)(6) motion is not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." FragranceNet.com, Inc. v. FragranceX.com, Inc., 679 F. Supp. 2d 312, 324 (E.D.N.Y. 2010)(internal quotations and citations omitted).

Though the Defendants primarily move to dismiss pursuant to Rule 12(b)(6), they also contend that GEICO's First Cause of Action for a declaratory judgment should be dismissed in favor of arbitration. See Arguelles'/PC Defendants' Memorandum of Law ("Arguelles Memo") at pp. 7-10. It therefore appears that the Defendants seek to dismiss GEICO's declaratory judgment claim

11

pursuant to Fed. R. Civ. P. 12(b)(3). When considering a motion under Rule 12(b)(3), the Court must accept the facts alleged in the Complaint as true and draw all reasonable inferences in favor of the non-moving party. Friedman v. Schwartz, 2009 U.S. Dist. LEXIS 20249 at * 13 (E.D.N.Y. 2009). However, the Court also may look beyond the allegations of the complaint and "consider materials outside of the pleadings." M.N.H. Exps. v. B.A.T. Wear, Inc., 2006 U.S. Dist. LEXIS 50754 at * 4 (E.D.N.Y. 2006).

## II.    The Relevant Regulatory Framework and the Mallela Decision

To determine whether GEICO's Complaint states claims under the RICO Act, for common law fraud, and for unjust enrichment, it is necessary to consider the statutory and regulatory framework in which no-fault charges are submitted to insurers. The New York Legislature has established a comprehensive statutory framework to ensure that professional healthcare services are provided only by individuals duly licensed to practice those professions, and that such individuals are employed only by entities that themselves are lawfully licensed to employ such professionals and provide such services. This statutory framework is rooted in New York's prohibition against the corporate practice of medicine, and is designed to protect the public health, safety and welfare by prohibiting non-physicians from employing physicians, controlling their practices, and creating inherent conflicts that interfere with independent medical judgment, inevitably leading to fraud, abuse, and risk to patients.

N.Y. Bus. Corp. Law ("BCL") §§ 1503(a) et seq. specifically permit the organization of corporations "for the purpose of rendering . . . [a] professional service", provided they satisfy all of the requirements necessary to be formed and operated as a professional corporation. For example, a professional corporation must be organized only by individuals authorized to render the professional service that the corporation will render (id.); and shares in the corporation only may be issued to individuals "engaged in the practice of such profession in such corporation" (BCL § 1507).

12

Furthermore, pursuant to BCL § 1507, "[a]ll shares issued, agreements made, or proxies granted in violation of [such proscriptions] shall be void." Id.

The rigorous restrictions contained in Article 15 of the BCL are meant to "ensure that a professional service corporation renders professional services only through qualified members of the professions and are in fact controlled only by qualified members." N.Y. St. Legis. Ann. 1970, p. 129 (emphasis added). In particular, restrictions in BCL § 1507 were designed to "insure that a professional service corporation [such as Vincent PC and Arguelles PC herein] could not be controlled by a lay person." N.Y. St. Legis. Ann. 1971, p. 130 (emphasis added).

In Mallela, supra, the Second Circuit certified to the New York Court of Appeals the question of whether "a medical corporation that was fraudulently incorporated under N.Y. Business Corporation Law §§ 1507, 1508, and N.Y. Education Law § 6507(4)(c) [is] entitled to be reimbursed by insurers, under New York Insurance Law §§ 5101 et seq. and its implementing regulations, for medical services rendered by licensed medical practitioners." 4 N.Y.3d at 320.    The Court unanimously answered the question as follows: "[w]e accepted the certification and now answer that such corporations are not entitled to reimbursement." Id. The Court noted that the issue was whether "insurance carriers may withhold payment for medical services provided by fraudulently incorporated enterprises." Id. at 319. The Court held: "[w]e conclude that they may." Id. The Court made clear that professional corporations that fail to comply with licensing requirements are ineligible to collect No-Fault Benefits, and insurers may look beyond a facially valid license to determine whether there was a failure to abide by state and local law, for instance by engaging in the corporate practice of medicine. Id. at 321-322. (Emphasis added).[4]

---

[4] The corporate practice of medicine incorporates New York's prohibition of fee-splitting between physicians and non-medical professionals. See N.Y. Educ. Law § 6509-a (expressly prohibiting fee splitting between physicians and non-medical professionals); see also 8 N.Y.C.R.R. § 29.1(b)(4)(defining fee splitting with non-medical professionals as "unprofessional conduct").

The Court also made clear that insurers could maintain a cause of action for fraud or unjust enrichment to recoup payments made to fraudulently incorporated professional corporations. Id. at 322; see also State Farm Mut. Auto. Ins. Co. v. Rabiner, 749 F. Supp. 94, 99 (E.D.N.Y. 2010) (Mallela "recognized that insurers could maintain a cause of action for fraud or unjust enrichment to recoup such payments"); State Farm Mut. Auto. Ins. Co. v. Grafman, 655 F. Supp. 2d 212, 222 (E.D.N.Y. 2009)(same).

## III.    GEICO's Civil RICO Claims are Sufficiently Pleaded

As the Court is aware, GEICO has alleged several civil RICO claims against Soltanov and Arguelles, including: (i) the Second and Sixth Causes of Action for violation of 18 U.S.C. § 1962(c), the "substantive" RICO statute; and (ii) the Third and Seventh Causes of Action for violation of 18 U.S.C. § 1962(d), the "RICO conspiracy" statute.

To state a claim for violation of Section 1962(c), GEICO was obligated to allege: (i) that the defendants; (ii) through the commission of two or more acts; (iii) constituting a pattern; (iv) of racketeering activity; (v) directly or indirectly conduct or participate in; (vi) an enterprise; (vii) the activities of which affect interstate or foreign commerce. See Moss v. Morgan Stanley, Inc., 719 F.2d 5, 17 (2d Cir.1983); see also Gov't Emples. Ins. Co. v. Hollis Med. Care, P.C., 2011 U.S. Dist. LEXIS 130721 at * 11 (E.D.N.Y. 2011).

Distilled to their essence, the Defendants' arguments for dismissal of GEICO's civil RICO claims amount to the following: (i) a contention that GEICO has not sufficiently alleged Arguelles' "participation" in the PC Defendants/RICO enterprises; (ii) a contention that GEICO has not sufficiently alleged a "pattern of racketeering activity"; and (iii) a contention that – because GEICO's substantive RICO claims under 18 U.S.C. § 1962(c) supposedly are subject to dismissal, GEICO's RICO conspiracy claims under Section 1962(d) likewise are subject to dismissal. See Arguelles

14

Memo at pp. 10-27; Soltanov's Memorandum of Law ("Soltanov Memo") at pp. 4-13. As set forth

below, none of these arguments has any merit.

## A.     GEICO Sufficiently Has Alleged Arguelles' Participation in the PC Defendant/RICO Enterprises

The Supreme Court has interpreted "participation" in the RICO context to mean

"participation in the operation or management of the enterprise." De Falco v. Bernas, 244 F.3d 286,

309 (2d Cir. 2001). Under the "operation or management" test, to conduct or participate, directly or

indirectly, in the conduct of an enterprise's affairs, "one must have some part in directing those

affairs". Id. That said, RICO liability is not limited to those with primary responsibility, nor to those

with a formal position in the enterprise, but some part in directing the enterprise's affairs is required.

Id.; see also Hollis, supra at * 19 (same). Put another way, "it is not enough to merely take directions

and perform tasks that are necessary and helpful to the enterprise … or provide goods and services

that ultimately benefit the enterprise. Instead, the key question is whether the provision of these

services allows the defendant to direct the affairs of the enterprise." State Farm Mut. Auto. Ins. Co. v.

Cohan, 2009 U.S. Dist. LEXIS 125653 at * 26 - * 27 (E.D.N.Y. 2009)(internal quotations and

citation omitted).

In this context, the participation and management test "typically has proven to be a relatively

low hurdle for plaintiffs to clear, especially at the pleading stage." Id., quoting First Capital Asset

Mgmt. v. Satinwood, Inc., 385 F.3d 159, 176 (2d Cir. 2004). Indeed:

> It is not always reasonable … to expect that when a defrauded plaintiff frames his complaint,
> he will have available sufficient factual information regarding the inner workings of a RICO
> enterprise to determine whether a defendant was merely "substantially involved" in the RICO
> enterprise or participated in the "operation or management" of the enterprise. … Thus, where
> the role of the particular defendant in the RICO enterprise is unclear, plaintiffs may well be
> entitled to take discovery on this question.

AIU Ins. Co. v. Olmecs Med. Supply, Inc., 2005 U.S. Dist. LEXIS 29666 at * 26 (E.D.N.Y.

2005)(internal citations omitted).

In the present case, the Defendants home in on the "participation" element, and contend that – because GEICO has alleged that Arguelles ceded beneficial ownership and control over the PC Defendants to Soltanov – it cannot simultaneously allege that she participated in the RICO enterprises, i.e. the PC Defendants, sufficient to support RICO liability. See Arguelles Memo at pp. 10-25.

This argument does not stand up to any serious scrutiny. While GEICO does allege that Arguelles ceded beneficial ownership and control over the PC Defendants to Soltanov, it also alleges that – as an unlicensed layperson – Soltanov could not legally own, control, or derive economic benefit from the PC Defendants in the first instance. See Complaint at ¶¶ 17, 24. GEICO further alleges that – because the PC Defendants were fraudulently incorporated and unlawfully split fees with Soltanov – they were not eligible to bill for or to collect no-fault benefits in the first instance. Id. at ¶¶ 4, 24-27. GEICO further alleges that, to enable Soltanov to fraudulently incorporate the PC Defendants, and unlawfully own, control, and derive economic benefit from the PC Defendants, Arguelles: (i) sold the use of her medical license to Soltanov so that the PC Defendants could be incorporated in the first instance; (ii) agreed to falsely represent in the certificate of incorporation filed with the Department of Education that she was the true shareholder, director and officer of the PC Defendants; (iii) agreed to falsely represent in the biennial statements filed thereafter that she was the true shareholder, director and officer of the PC Defendants; and (iv) entered into a series of "management," "billing," "marketing," and "lease" agreements with Soltanov that were designed to, and did, conceal Soltanov's unlawful ownership interest in and control over the PC Defendants. Id. at ¶¶ 33, 35, 43-45, 50, 52, 60-62.

Arguelles therefore was the sine qua non of the PC Defendant enterprises, inasmuch as – without her participation – they would not have come into existence in the first place, would not be

16

able to exist on a continuing basis, and would not be able to continue their unlawful operations or serve as the vehicles through which the Defendants' fraudulent scheme was accomplished. Tellingly, though the Defendants' papers are larded with references to the generalized RICO participation pleading standards, they carefully avoid any reference to the large amount of precedent from this Court, in substantially similar cases, featuring virtually identical pleadings, dealing with substantially similar no-fault fraud rings, in which this Court has refused to dismiss Section 1962(c) claims against the nominal physician-owners of fraudulently incorporated professional corporations.

For example, in Liberty Mut. Ins. Co. v. Excel Imaging, P.C., 2012 U.S. Dist. LEXIS 86303 (E.D.N.Y. 2012), as in the present case, the plaintiff-insurers alleged that non-physicians secretly and unlawfully owned and controlled a medical professional corporation and used it to submit fraudulent no-fault billing, while designating a series of licensed physicians as the professional corporation's nominal or "paper" owners. A copy of the Complaint in the Excel Imaging action is annexed as Exhibit "A" to the accompanying Declaration of Max Gershenoff ("Gershenoff Decl."). As in the present case, the Excel Imaging plaintiffs alleged that: (i) the non-physicians purchased the use of the physicians' licenses so that they could fraudulently incorporate the professional corporation; (ii) the physicians agreed to falsely represent in the certificate of incorporation and biennial statements filed with the Department of Education that they truly owned and controlled the professional corporation; (iii) once the professional corporation was incorporated, the physicians ceded true beneficial ownership and control over the professional corporation to the non-physicians; (iv) the physicians never had any true ownership interest in or control over the professional corporation; (v) true ownership interest in and control over the professional corporation rested at all times entirely with the non-physicians; (vi) all decision-making authority relating to the operation and management of the professional corporation was vested entirely with the non-physicians; and (vii) the non-physicians

17

effectuated the unlawful ownership and control over the professional corporation through a series of ersatz "management," "marketing," "lease," "billing," and/or "collections" agreements between the physicians, the professional corporation, and the non-physicians. See Gershenoff Decl., Exhibit "A", ¶¶ 48-114.

The physicians in Excel Imaging moved to dismiss the plaintiff-insurers' RICO claims, contending – like the Defendants in the present case – that the plaintiffs had failed to sufficiently allege their participation in the RICO enterprise. Excel Imaging, supra at * 63 - * 64. In this context, it is important to note that the connection between the nominal physician-owners in Excel Imaging and the professional corporation-enterprise arguably was even more attenuated than in the present case, inasmuch as the plaintiff-insurers in Excel Imaging had alleged that the nominal physician-owners were absentee-owners who did not even practice medicine through the professional corporation. See Gershenoff Decl., Exhibit "A", ¶¶ 115-123.[5] Even so, Judge Jack Weinstein declined to dismiss the RICO claims against the Excel Imaging physicians, holding that "[i]n the present case, Liberty Insurance's allegations that … that the Nominal Owner Defendants agreed to serve as the 'paper' owners of Excel in exchange for a fee are sufficient to support the claim that the defendants actively participated in the creation or management of Excel." Excel Imaging, supra at * 63 - * 64.

Similarly, in Allstate Ins. Co. v. Bogoraz, 818 F. Supp. 2d 544 (E.D.N.Y. 2011), as in the present case, the plaintiff-insurers alleged that non-physicians secretly and unlawfully owned and controlled a series of medical professional corporations and used them to submit fraudulent no-fault billing, while designating a series of licensed physicians as the professional corporations' nominal or

---

[5] By contrast, in the present case GEICO alleges that Arguelles personally performed some of the Fraudulent Services. See Complaint at ¶¶ 42, 59, 76.

"paper" owners. A copy of the Complaint in the Bogoraz action is annexed as Exhibit "B" to the Gershenoff Decl.

As in the present case, and in the Excel Imaging case, the Bogoraz plaintiffs alleged that: (i) a non-physician conspired with a physician to falsely represent that the physician truly owned and controlled a professional corporation; (ii) once the professional corporation was incorporated, the physician ceded true beneficial ownership and control over the professional corporation to the non-physician; (iii) the physician never had any true ownership interest in or control over the professional corporation; (iv) true ownership interest in and control over the professional corporation rested at all times entirely with the non-physician; (v) all decision-making authority relating to the operation and management of the professional corporation was vested entirely with the non-physician; and (vi) the non-physician unlawfully siphoned off the revenues from the professional corporation through a series of ersatz "management" and "consulting" agreements. See Gershenoff Decl., Exhibit "B", ¶¶ 63, 71-72, 75, 104, 107-109, 134, 136-138.

The physician in Bogoraz moved to dismiss the plaintiff-insurers' RICO claims, contending – much like the Defendants in the present case – that the plaintiff-insurers' complaint "'pleads itself out of court' because the allegations, if true, demonstrate that defendant did not have dominion or control over" the professional corporation and therefore lacked any intention to participate in the scheme. Bogoraz, 818 F. Supp. 2d. at 552. Judge Sandra J. Feuerstein rejected this argument, holding that "Defendant's argument that the allegations of his failure to operate, manage or control [the professional corporation] mandates dismissal [are] unavailing. These allegations are foundational to plaintiffs case; as a medical professional, had defendant been the sole owner, operator and manager as he represented himself to be, there would be no fraud and he would have been entitled to receive no-fault benefits." Id. at 553.

19

Other Courts, though not addressing the RICO participation issue head-on, consistently have held that virtually identical allegations against the nominal or "paper" physician-owners of fraudulently-incorporated professional corporations are sufficient to state a Section 1962(c) claim against the physicians – despite allegations to the effect that the physicians ceded total control over the professional corporations to unlicensed, non-physicians.

For instance, in Allstate Ins. Co. v. Lyons, 843 F. Supp. 2d 358 (E.D.N.Y. 2012), Allstate Ins. Co. v. Valley Physical Med. & Rehab., P.C., 2009 U.S. Dist. LEXIS 91291 (E.D.N.Y. 2009), and State Farm Mut. Auto. Ins. Co. v. Eastern Medical, P.C., Docket No. CV 05-3804 (ENV)(RML), as in the present case, the plaintiff-insurers pleaded Section 1962(c) claims based on allegations that non-physicians secretly and unlawfully owned and controlled a series of medical professional corporations and used them to submit fraudulent no-fault billing, while designating a series of licensed physicians as the professional corporations' nominal or "paper" owners. See Complaint in Lyons, annexed as Exhibit "C" to the Gershenoff Decl., at ¶¶ 374-394, 420-478; Complaint in Valley Physical, annexed as Exhibit "D" to the Gershenoff Decl., at ¶¶ 7-8, 12, 18-19, 26-35; Complaint in Eastern Medical, annexed as Exhibit "E" to the Gershenoff Decl., at ¶¶ 15-50. In each of the aforesaid cases, the plaintiff-insurers alleged that the professional corporations constituted RICO enterprises, and that the nominal physician-owners ceded total control over the professional corporations to the unlicensed non-physicians. Id. In each of the aforesaid cases, certain of the nominal physician owners moved to dismiss the RICO claims asserted against them, and in each case the Court denied the motions to dismiss, finding the RICO claims to be sufficiently pleaded. See Lyons, 843 F. Supp. 2d at 367-374; Valley Physical at * 12 - * 27; Eastern Medical, Docket No. CV 05-3804 at Docket No. 148, at pp. 2-6.

20

Simply put, without Arguelles' participation in the Defendants' fraudulent scheme, the scheme never could have been carried out in the first instance. It was she who willingly provided the license necessary to incorporate the PC Defendants – the alleged RICO enterprises – and it was she who made the continuing misrepresentations to the Education Department that were necessary to enable the PC Defendants to continue to operate. While GEICO has alleged that Arguelles ceded beneficial ownership and control over the PC Defendants to Soltanov, she retained the power to shut them down at a moment's notice, by – for instance – withdrawing from the scheme, advising the Education Department that the PC Defendants were fraudulently incorporated, and filing for their immediate dissolution. It therefore is absurd for Defendants to suggest that Arguelles lacked the ability to direct the affairs of the RICO enterprises. She enabled the affairs of the RICO enterprises, both in the first instance and on an ongoing basis.

In any case, GEICO sufficiently has alleged Arguelles' participation in the PC Defendant RICO enterprises by alleging that she performed Fraudulent Services at the PC Defendants. See Complaint at ¶¶ 42, 59, 76. Judges in this District have held the performance of such services on behalf of a PC Defendant-RICO enterprise sufficient to allege participation in the enterprise – considering that, if the physicians had not performed the services, there would be no opportunity to submit fraudulent billing to insurers. See, e.g., Allstate Ins. Co. v. Rozenberg, 590 F. Supp. 2d 384, 391-392 (E.D.N.Y. 2008)(allegations that nominal physician owner performed fraudulent services "that drove the fraud" held sufficient to plead his participation in RICO enterprise); AIU Ins. Co. v. Olmecs Med. Supply, Inc., 2005 U.S. Dist. LEXIS 29666 at * 24 - * 29 (E.D.N.Y. 2005)(physicians who "enabled the scheme" by providing fraudulent services held to have participated in RICO enterprise).[6]

---

[6] The Defendants do not attempt to argue that Soltanov did not participate in the PC Defendant RICO enterprises. See Soltanov Memo, passim; Arguelles Memo, passim. They would be hard-pressed to do so,

21

**B.    GEICO Sufficiently Has Alleged a Pattern of Racketeering Activity**

Soltanov, in particular, argues that GEICO's RICO substantive RICO claims should be dismissed because GEICO supposedly has not sufficiently pleaded the "pattern of racketeering activity" necessary to support RICO liability. See Soltanov Memo at pp. 5-13. As discussed below, the weight of authority from this Court suggests otherwise.

To plead a "pattern of racketeering activity" sufficient to satisfy the RICO statute, GEICO was obligated to allege facts tending to show that "the racketeering predicates are related, and that they amount to or pose a threat of continued criminal activity." See H.J. Inc. v. Northwestern Bell Tel. Co., 492 U.S. 229, 239 (1989). The continuity necessary to prove a RICO pattern can be alleged either as closed-ended continuity, or open-ended continuity. Cofacredit, S.A. v. Windsor Plumbing Supply Co., Inc., 187 F.3d 229, 242 (2d Cir. 1999).

**1.    GEICO Sufficiently Has Alleged a Closed-Ended Pattern of Racketeering Activity**

To allege closed-ended continuity, GEICO was required to plead "a series of related predicates extending over a substantial period of time. The relevant period is the time during which the RICO predicate acts occurred, not the time during which the underlying scheme operated or the underlying dispute took place … ." Valley Physical, supra at * 24. Generally, to plead closed-ended continuity, the predicate acts must extend over a period of more than two years. See, e.g., Chubb & Son Inc. v. Kelleher, 2010 U.S. Dist. LEXIS 141842 at * 17 (E.D.N.Y. 2010).

As the Court may note, GEICO has annexed – as Exhibits "1" and "2" to the Complaint – charts specifying the Defendants' individual predicate acts of mail fraud and the dates on which they

---

given the decisions of this Court in analogous cases. See, e.g., Excel Imaging, supra at * 63 - * 64; Hollis, supra at * 19 - * 22; State Farm Mut. Auto. Ins. Co. v. CPT Med. Servs., P.C., 2008 U.S. Dist. LEXIS 71156 at * 36 - * 38 (E.D.N.Y. 2008)(all finding RICO participation sufficiently pleaded against non-physicians who secretly and unlawfully owned and controlled professional corporation-enterprises).

occurred. These charts repeatedly are cited throughout the Complaint. See Complaint at ¶¶ 5, 106,
114, 133, 141. Exhibit "1" consists of a list of more than 3,900 fraudulent Vincent PC bills that the
Defendants mailed or caused to be mailed, and indicates that the first such mailing was sent on or
about December 16, 2004, and the last such mailing was sent on or about July 17, 2008. Exhibit "2"
consists of a list of more than 13,600 fraudulent Arguelles PC bills that the Defendants mailed or
caused to be mailed, and indicates that the first such mailing was sent on or about September 21,
2006, and the last such mailing was sent on or about November 7, 2011.

GEICO's Second Cause of Action is predicated on the fraudulent billing that the Moving
Defendants submitted, or caused to be submitted, through Vincent PC. As noted above, this billing –
which is reflected in Exhibit "1" to the Complaint – consisted of thousands of bills mailed over the
course of more than three and a half years. Similarly, GEICO's Sixth Cause of Action is predicated
on the fraudulent billing that the Defendants submitted, or caused to be submitted, through Arguelles
PC. This billing – which is reflected in Exhibit "2" to the Complaint – consisted of thousands of bills
mailed over the course of more than five years.

This Court repeatedly has held that that allegations of a similar number of predicate acts
committed over a similar timespan satisfies the closed-ended continuity requirement. See, e.g.,
Eastern Medical, Docket No. CV 05-3804 at Docket No. 148, at p. 3 (at least 600 fraudulent claims
submitted over the course of more than six years, "easily satisfies the continuity requirement of
RICO"); Valley Physical, supra at * 22 - * 25, Gershenoff Decl., Exhibit "D" at ¶ 72, and Exhibit B
(holding that even fewer predicate acts than are alleged in the present case, occurring over a shorter
period of time than alleged in the present case, satisfied the closed-ended pattern requirement);
Liberty Mut. Ins. Co. v. Blessinger, 2007 U.S. Dist. LEXIS 21781 at * 7 - * 8 (E.D.N.Y.
2007)(almost three years of racketeering activity held sufficient to satisfy closed ended continuity,

23

"especially in light of the volume of predicate acts alleged to have taken place during that time period"); State Farm Mut. Auto. Ins. Co. v. Kalika, 2006 U.S. Dist. LEXIS 97454 at * 46 - * 47 (E.D.N.Y. 2006), adopted by 2007 U.S. Dist. LEXIS 90322 (E.D.N.Y. 2007)(Amon, J.)(1,256 fraudulent claims submitted over a four-year period satisfied closed-ended continuity requirement); Lavian v. Haghnazari, 884 F. Supp. 670, 683 (E.D.N.Y. 1995)(finding closed-ended continuity where pattern of racketeering activity extended over twenty-nine months).

## 2. GEICO Sufficiently Has Alleged an Open-Ended Pattern of Racketeering Activity

To establish open-ended continuity, a plaintiff need not show that the predicates extended over a substantial period of time, but rather "must show that there was a threat of continuing criminal activity beyond the period during which the predicate acts were performed." De Falco v. Bernas, 244 F.3d 286, 323 (2d Cir. 2001). "This threat of continuing criminal activity must extend beyond the period during which the predicate acts were performed." SKS Constructors, Inc. v. Drinkwine, 458 F. Supp. 2d 68, 78 (E.D.N.Y. 2006)(internal quotation and citation omitted). "The key considerations to the question of open ended continuity are the nature of the enterprise and the predicate acts alleged. ... If the enterprise alleged is engaged in 'inherently unlawful' acts, there is a threat of continuing criminal activity and open ended continuity exists." Id. (Internal citation omitted).

"On the other hand, if the enterprise is engaged in a legitimate business, an allegation of open ended continuity requires evidence supporting an inference that the predicate acts are the regular way of doing business, or that the nature of the predicate acts themselves implies a threat of continuing criminal activity." SKS Constructors, Inc., supra; see also G-I Holdings v. Baron & Budd, 238 F. Supp. 2d 521, 544 (S.D.N.Y. 2002)(same). "A threat of continuity may be established where the predicate acts are inherently unlawful and were made in pursuit of inherently unlawful goals even if, as here, the period spanned by the racketeering acts was short. ... Essentially, if the nature of the acts indicate that the defendants had a continuing intent and ability to carry on the racketeering activity, a

24

threat of continuity is established." <u>Metro. Transp. Auth. v. Contini</u>, 2005 WL 1565524  at  *  4 (E.D.N.Y. 2005).

By all of these metrics, GEICO sufficiently pleaded open-ended continuity in its Second and Sixth Causes of Action. <u>First</u>, the Complaint alleges that the Vincent PC and Arguelles PC enterprises are engaged in inherently unlawful acts – <u>to</u> <u>wit</u>, that they operate fraudulently incorporated professional corporations, secretly owned and controlled by a non-physician, split fees with a non-physician, bill for services provided by independent contractors, and are the vehicles through which fraudulent claims for no-fault benefits are submitted to GEICO and other insurers, all in violation of New York law. <u>See</u> Complaint at ¶¶ 20-88, 108, 135.[7]  In addition, GEICO has alleged that these inherently unlawful acts were taken in pursuit of inherently unlawful goals – namely, the theft of money from GEICO through the submission of fraudulent no-fault charges. <u>Id.</u> <u>See</u>, <u>e.g.</u>, <u>Metro. Transp. Auth.</u> at  *  4 (open-ended continuity found where embezzlement, an act considered inherently unlawful, was committed in pursuit of an inherently unlawful goal, namely the theft of money from the MTA).

<u>Second</u>, even assuming – for argument's sake – that a unlawfully-incorporated professional corporation that secretly is owned and controlled by a non-physician and used for his financial benefit as a vehicle to submit fraudulent no-fault claims could be considered a "legitimate business", GEICO has alleged that the predicate acts of mail fraud are the regular way that the Defendants operate Vincent PC and Arguelles PC, inasmuch as Vincent PC and Arguelles PC never have been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Vincent PC and Arguelles PC to function <u>See</u> Complaint at ¶¶ 107, 134. Moreover, these allegations are not made in a vacuum – rather, they are the culmination of a series of allegations that

---

[7] Indeed, Vincent PC's and Arguelles PC's very corporate existence is an unlawful act, considering that their existence depends on continuing misrepresentations made to – among others – the New York Department of Education. <u>See</u> Complaint at ¶¶ 108, 135.

specify why Vincent PC and Arguelles PC are not eligible to bill for or to collect No-Fault Benefits (see Complaint at ¶¶ 20-88), and which specify how the Defendants nonetheless have used Vincent PC and Arguelles PC as vehicles to submit fraudulent no-fault claims while simultaneously attempting to conceal the fact of Vincent PC's and Arguelles PC's ineligibility. Id.

In addition, the Complaint includes, as Exhibits "1" and "2", charts listing a very large sample of the predicate acts of mail fraud committed by the Defendants through Vincent PC and Arguelles PC. Simply put, at the pleading stage GEICO sufficiently has alleged that the Defendants operated Vincent PC and Arguelles PC through predicate acts of mail fraud. See, e.g., SKS Constructors, Inc., 458 F. Supp. 2d at 80 ("although the Drinkwine Defendants are engaged in the home improvement business, a business that is not criminal in nature, it is alleged that the predicate acts are the only way in which the business operated. While this may prove to be a difficult fact to establish at trial, it is sufficient to establish open-ended continuity for the purpose of this motion to dismiss"); G-I Holdings, 238 F. Supp. 2d at 544-546 (open-ended continuity found where law firm filed false affidavits in connection with asbestos litigation, since taking and filing affidavits was part of the practice of law, which in turn was the law firm's regular, "legitimate" business).

Third, GEICO has alleged that "the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity." See Complaint at ¶¶ 107, 134. Again, this allegation is not made in a vacuum, but rather is the culmination of a series of allegations recounting how Soltanov recruited Arguelles to give Vincent PC and Arguelles PC the appearance of legitimacy, how Arguelles sold her medical license to Soltanov, how the Defendants caused Vincent PC and Arguelles PC to be fraudulently incorporated, how the Defendants concealed Soltanov's unlawful ownership and control over Vincent PC and Arguelles PC, and how Soltanov has used Vincent PC and Arguelles PC to do indirectly what he is forbidden from doing directly,

26

namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services. See id. at ¶¶ 20-88.

The Defendants cannot colorably contend that such a complicated scheme – involving the identification of a pliable doctor, submission of fraudulent documents to the New York Education Department, submission of fraudulent charges to GEICO and other insurers, and the creation of phony business relationships between Soltanov, Arguelles, Vincent PC, and Arguelles PC to enable Soltanov to siphon away all of Vincent PC's and Arguelles PC's resulting profits – does not raise the specter of continuing criminal activity. See, e.g., United Computer Capital Corp. v. Daidone, 2005 WL 579565 at * 2 (N.D.N.Y. 2005) (open-ended continuity found where defendants were alleged to have engaged in "elaborate schemes" which "by their very nature project[] into the future with a threat of repetition" (internal quotations and citations omitted).

Fourth, GEICO specifically has alleged that the Defendants continue to attempt collection on their fraudulent charges. See Complaint at ¶¶ 107, 134. Considering that GEICO has alleged that the Defendants' criminal activity actually is continuing, the threat of continued criminal activity is not only implied, but overt and actual. See, e.g., Azrielli v. Cohen Law Offices, 21 F.3d 512 (2d Cir. 1994)(a series of fraudulent sales of securities over at least one year, coupled with the fact that the defendants apparently had been trying to continue to sell securities, permitted a jury to find a RICO pattern); Beauford v. Helmsley, 865 F.2d 1386 (2d Cir. 1989)(en banc), vacated and remanded, 492 U.S. 914, adhered to on remand, 893 F.2d 1433, cert. denied, 493 U.S. 992 (1989)(allegations that defendants had engaged in a one-time mailing of 8,000 copies of fraudulent documents in connection with a condominium conversion plan was sufficient to plead a pattern of racketeering activity, where there was a basis to infer that similar mailings would occur in the future). Accordingly, GEICO sufficiently has pleaded open-ended continuity in its Second and Sixth Causes of Action.

In this context, it is worthwhile to note that this Court repeatedly has held that similar complaints against similar no-fault fraud rings sufficiently alleged open-ended patterns of racketeering activity. See, e.g., Lyons, supra, 843 F. Supp. 2d at 369-370 (open-ended pattern sufficiently pleaded where, "[i]n light of the Complaint's allegations of fraudulent incorporation and of the very numerous and regular inflated billings, it is reasonable to infer that the PCs operated by defendants existed for criminal purposes."); Cohan, supra at * 30 (open-ended pattern sufficiently pleaded where the pattern "continue[d] with the attempts by the Dental PCs to collect payment from the plaintiff"); Kalika, supra at * 46 (open-ended pattern sufficiently pleaded where "defendants [were] seeking to collect additional amounts on claims submitted but not yet paid").

3.   **GEICO's RICO Claims are Not Based Solely on Allegations of Fraudulent Incorporation and Do Not Allege a Single Victim – and, in Any Case, This Court Has Sustained Similar RICO Claims Under Analogous Circumstances**

Soltanov contends that GEICO has not sufficiently pleaded a RICO pattern because its mail fraud allegations supposedly involve a single victim and center on a single type of misrepresentation – namely, misrepresentation regarding Arguelles' ownership and control over the PC Defendants. See Soltanov Memo at pp. 6-13. Soltanov is wrong.

As a preliminary matter, GEICO has not alleged a single type of misrepresentation centering around the PC Defendants' fraudulent incorporation – it also has alleged that the Defendants fraudulently misrepresented that the billed-for services were provided by the PC Defendants' employees and therefore were reimburseable, when in fact the billed-for services in many cases were performed by independent contractors and therefore were unreimburseable. See Complaint at ¶¶ 2, 4, 29, 73-88, 106, 133. Tellingly, the Defendants elide this point in their memoranda. See Soltanov Memo, passim; Arguelles Memorandum, passim.

Even if GEICO had simply alleged that the Defendants repeatedly advanced a single type of misrepresentation regarding the PC Defendants' corporate legitimacy, this Court has sustained civil

28

RICO claims where the only alleged misrepresentations went to a professional corporation's corporate structure. See, e.g., Excel Imaging, supra at * 2 - * 3, * 69 (sustaining civil RICO claims predicated solely on misrepresentations as to the fraudulent incorporation of the underlying professional corporation); Gov't Emples. Ins. Co. v. Damien, 2011 U.S. Dist. LEXIS 138365 at * 19 (E.D.N.Y. 2011)(on default judgment motion, RICO claims were legally sufficient despite being predicated solely on misrepresentations as to professional corporations' corporate legitimacy and performance of services by independent contractors); c.f. Rabiner, supra, 749 F. Supp. 2d at 102-103 (plaintiff-insurer stated common law claims based on misrepresentations regarding corporate structure of professional corporation even though it did not allege that the billed-for medical services were unnecessary or not rendered in the first instance); State Farm Mut. Auto. Ins. Co. v. Accurate Med., P.C., 2007 U.S. Dist. LEXIS 74459 at * 9 (E.D.N.Y. 2007)("[C]ontrary to the moving defendants' argument that plaintiff was not injured by defendants' fraudulent incorporation, ... plaintiff plainly was injured by paying no-fault claims in reliance on defendants' misrepresentations that the PC defendants were valid medical professional corporations.")

Soltanov also contends that GEICO has not sufficiently alleged a RICO pattern because the allegations in the present case supposedly involve only a single victim – namely GEICO. See Soltanov Memo at pp. 6-13. This contention simply does not stand up to inspection. As the Court may note, GEICO repeatedly has alleged that the Defendants' scheme targeted not only GEICO, but the entire New York automobile insurance industry. See, e.g., Complaint at ¶¶ 31-32, 44, 61, 78, 95, 107-108, 115, 134-135, 142. GEICO also has alleged that the Defendants' scheme involved – indeed, dependent upon – misrepresentations to the State of New York. See id. at ¶¶ 35, 91. Under analogous circumstances, this Court has found substantially similar allegations sufficient to plead a RICO pattern. See Hollis, supra at * 30 (closed-ended pattern allegations sufficient where large number of

fraudulent no-fault claims were mailed over a multi-year period and "other victims of the fraud—the State of New York and other insurers—are alleged as well"); Valley Physical, supra at * 25 - * 26 (closed-ended continuity sufficiently alleged where numerous predicate acts occurred over a number years and state of New York and other insurers were also alleged as victims).

Accordingly, GEICO sufficiently has pleaded both open-ended and closed-ended patterns of racketeering activity, and its substantive RICO claims therefore ought not be dismissed.

**C.     Because GEICO's Substantive RICO Claims are Not Subject to Dismissal, its RICO Conspiracy Claims Likewise Should Not Be Dismissed**

The Defendants argue that, because GEICO's substantive RICO claims supposedly are subject to dismissal, its RICO conspiracy claims likewise should be dismissed. See Arguelles Memo at pp. 25-26. However, as discussed above, GEICO's substantive RICO claims are not subject to dismissal, so there is no basis for dismissal of GEICO's RICO conspiracy claims.

**IV.    GEICO's Common Law Fraud and Unjust Enrichment Claims Are Not Barred by Res Judicata or Collateral Estoppel**

GEICO also has alleged common law claims against the Defendants, including: (i) the Fourth and Eighth Causes of Action for common law fraud; and (ii) the Fifth and Ninth Causes of Action for unjust enrichment.

The Defendants contend – in conclusory fashion – that GEICO's common law fraud and unjust enrichment claims are barred by res judicata and collateral estoppel. See Arguelles Memo at pp. 26-27. These arguments are based on the notion that GEICO is attempting through this action to recover money that it paid as the result of the Defendants' success in Civil Court or District Court collections actions. However, as GEICO repeatedly has stated (see Docket No. 12), it does not seek to recover monies paid on any fraudulent billing that has been the subject of any New York state court litigation or arbitration. None of the more than $1,050,000.00 that GEICO seeks to recover through this action was paid to the Defendants as the result of any litigation or arbitration. Rather, all

30

of the money that GEICO seeks to recover through this action was paid voluntarily, in reliance on the Defendants' fraudulent billing. See Complaint at ¶¶ 89-96, and passim.

In any case, a "party may properly raise a defense of res judicata or collateral estoppel on a motion to dismiss pursuant to Rule 12(b)(6) only where the basis for that defense is set forth on the face of the complaint or established by the public record." Accurate, supra at * 6. The Defendants therefore cannot prevail on their res judicata argument without providing the Court with the specific state court decisions that they contend bar Plaintiffs' claims. Id.; see also State Farm Mut. Auto. Ins. Co. v. James M. Liguori, M.D., P.C., 589 F. Supp. 2d 221, 235 (E.D.N.Y. 2008) (same). They have been unable to do so for one simple reason - there are no state court decisions that bar Plaintiffs' claims regarding the more than $1,050,000.00 sought through this action.[8] Accordingly, to the extent that the Defendants' motions rest on res judicata or collateral estoppel, they should be denied.

## V.    The Defendants' Statute of Limitations Defense Should Not Be Resolved on a Motion Pursuant to Rule 12(b)(6)

The Defendants contend that GEICO's common law fraud and unjust enrichment claims are barred, in part, by the pertinent six-year statutes of limitation. See Arguelles Memo at pp. 28-32. For this proposition, the Defendants contend that in February 2010 – in the context of one of the Defendants' state court no-fault collections actions – GEICO moved for leave to assert an affirmative defense to the effect that the PC Defendants were fraudulently incorporated and therefore ineligible to collect No-Fault Benefits. Id. The Defendants further contend that, in support of the motion, GEICO filed an affirmation by its counsel in which it set forth a series of facts suggesting that

---

[8] Indeed, even if the Defendants were to assemble a handful of judicial decisions, arbitration awards, or settlements, such a presentation would not foreclose Plaintiffs' claims in this action – rather, it simply would limit Plaintiffs' potential recovery. See Liguori, 589 F. Supp. 2d at 235 ("Defendants do not contend that any or all claims at issue in this case are pending in state court litigations or arbitrations or were the subject of a settlement agreement. Further, it is entirely unclear why plaintiff's decision to settle some individual claims would waive its right to pursue the claims at hand on other individual claims. Defendants point to nothing to support that contention.")

Arguelles previously had been involved with fraudulently incorporated professional corporations other than Vincent PC and Arguelles PC. Id., see also Declaration of Donald J. Kravet ("Kravet Decl."), at Exhibit 2. The Defendants point to an except from the affirmation in which GEICO contended that it would be reasonable to conclude that Vincent PC and Arguelles PC likewise were fraudulently incorporated. Id.

As the Court may note, however, nothing in the February 2010 affirmation from GEICO's counsel demonstrates that GEICO had proof that Vincent PC and Arguelles PC were fraudulently incorporated. Id. Indeed, the February 2010 affirmation from GEICO's counsel asks the state court to order Arguelles and the PC Defendants to immediately provide the disclosure necessary to permit GEICO to determine whether the PC Defendants were, in fact, fraudulently incorporated. Id. Among other things, GEICO requested Arguelles' deposition. Id. Tellingly, the Defendants do not contend that the state court actually ordered any of the requested disclosure, much less Arguelles' deposition. Id. Nor do the Defendants specify whether, or when, the Defendants may have produced the disclosure requested in the February 2010 affirmation. Id. In fact, as may be evident from the Complaint, Arguelles did not turn up for a deposition until June 30, 2011, and the deposition did not conclude until July 19, 2011. See Complaint at ¶¶ 41, 58.

Even assuming, arguendo, that GEICO had some suspicion in February 2010 to the effect that the PC Defendants were fraudulently incorporated, GEICO has alleged that the Defendants worked assiduously to conceal their fraud. See Complaint at ¶¶ 89-97. Following discovery in this action, GEICO expects to present evidence to the effect that: (i) notwithstanding the February 2010 affirmation, the Defendants fought to avoid producing Arguelles for a deposition, thereby delaying her deposition until June-July 2011; (ii) notwithstanding the February 2010 affirmation, the Defendants fought to avoid producing the PC Defendants' financial records and – to date – they have

32

not produced the PC Defendants' financial records; and (iii) GEICO did not obtain the PC Defendants' bank records until late 2011, and only then through a third-party subpoena served on the PC Defendants' banks to which the PC Defendants failed to timely object.

Thus, even if, for argument's sake, GEICO was on inquiry notice in February 2010 as to the Defendants' fraudulent scheme, GEICO nonetheless expects to have – at the close of discovery – a viable argument that the pertinent limitations periods should be subject to equitable tolling, and that the Defendants in any case should be estopped from asserting them. These issues are intrinsically fact-specific and should not be resolved on a motion pursuant to Rule 12(b)(6). See, e.g., Globaltex Group, Ltd. v. Trends Sportswear, Ltd., 2009 WL 1270002 at * 4 (E.D.N.Y. 2009); see also Mandarino v. Mandarino, 180 Fed. Appx. 258, 261 (2d Cir. 2006)(reversing statute of limitations dismissal and holding that "the District Court should not have resolved the fact-specific equitable tolling issue on defendants' motion to dismiss [because w]hen . . . facts are disputed, the best practice is to analyze [the] question . . . in the context of summary judgment"); Brody v. Brody, 2009 U.S. Dist. LEXIS 17078 at * 7 - * 8 (S.D.N.Y. 2009)(collecting cases which stand for the proposition that fact questions regarding statute of limitations issues should not be resolved on a motion to dismiss); Flagg v. Skadden, Arps, Slate, Meagher & Flom Pension Plan, 2008 U.S. Dist. LEXIS 47613, at * 12 - * 13 (S.D.N.Y. 2008)(denying motion to dismiss where fact questions regarding applicability of equitable tolling or equitable estoppel precluded dismissal on limitations grounds prior to substantive discovery).

Indeed, Judges in this District repeatedly have held in similar circumstances that limitations arguments such as the one advanced here are not appropriate for resolution on a motion to dismiss. See Eastern Medical, supra at p. 5; Rabiner, supra, at * 104;  Allstate Ins. Co. v. Halima, 2009 U.S.

33

Dist. LEXIS 22443, * 21 – * 22 (E.D.N.Y. 2009); CPT Medical Services, P.C., supra, at * 30 - * 32;

Accurate, supra at * 5 (E.D.N.Y. 2007); Kalika, supra, at * 21.

In this context, it is important to note that – while the Court may take judicial notice of the

existence of the February 2011 affirmation – it should not, on a motion to dismiss, apply the contents

of the affirmation so as to dismiss GEICO's common law claims as time-barred. See Rashed v.

Astrue, 2010 U.S. Dist. LEXIS 78148, * 8 (E.D.N.Y. 2010)(stating that, on a motion to dismiss, a

court "may take judicial notice of … documents filed in another court, to establish the existence of

the documents and the fact of such litigation, but not for the truth of the matters asserted

therein")(internal citation omitted); Anderson News, L.L.C. v. Am. Media, Inc., 732 F. Supp. 2d 389,

404 (S.D.N.Y. 2010)(on a motion to dismiss, "courts will take judicial notice only of the existence of

other publicly-filed court documents, not of their contents").

## VI.    **GEICO's Declaratory Judgment Claim is Sufficiently Pleaded**

The Defendants advance a specious argument to the effect that GEICO's First Cause of

Action for a declaratory judgment is insufficiently pleaded because GEICO supposedly has not

sufficiently alleged the existence of an actual controversy. For this proposition, the Defendants

proffer a single case – Travelers Indem. Co. v. Liberty Med. Imaging Assocs., P.C., 2009 U.S. Dist.

LEXIS 29596 (E.D.N.Y. 2009). Though the Defendants elide the point, Liberty Med. Imaging

Assocs. involved a motion for default judgment, not a motion to dismiss pursuant to Rule 12(b)(6).

Specifically, the Liberty Med. Imaging Assocs. defendants defaulted and the insurer moved for

default judgment on all of its discrete claims, including its claim for a declaratory judgment similar to

the declaratory judgment claim that GEICO advances in the present case. The Court granted many

aspects of the default judgment, but denied the insurer's request for declaratory relief, determining

that the pleadings did not sufficiently establish the existence of an actual controversy. Id. at * 15 - *

17. The Court also noted that – in support of its motion for default judgment – the insurer had not

submitted sufficient additional materials, beyond the complaint, to establish the existence of an actual controversy. Id.

Simply put, there is considerable difference between the standards applicable on a motion for default judgment and the standards applicable to the present motion, which is a pre-discovery motion addressed to the pleadings. On a motion for default judgment, Courts accept the allegations in the complaint as true and make a final determination as to whether the allegations are legally sufficient to entitle the plaintiff to final relief on one or another discrete cause of action. See, e.g., Agamede Ltd. v. Life Energy & Tech. Holdings, Inc., 2007 U.S. Dist. LEXIS 4698 at * 3 (E.D.N.Y. 2007).

By contrast, on a motion to dismiss, the Court is not called upon to make a final determination as to whether the plaintiff is entitled to relief, but rather is called upon to determine whether the plaintiff has stated a cause of action. See, e.g., Bernheim v. Litt, 79 F.3d 318, 321 (2d Cir. 1996)(when adjudicating motion to dismiss under Rule 12(b)(6), the "issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims" (internal quotation marks and citations omitted)).

In Liberty Med. Imaging Assocs., the plaintiff-insurer was not asking the Court to sustain its declaratory judgment claim in the face of a defendant's motion to dismiss, so as to preserve the claim pending discovery and a trial on the merits. Rather, the plaintiff-insurer was asking the Court to grant it final relief based solely on the allegations in the complaint. The Court was unwilling to do so.

However, this Court consistently has refused to dismiss virtually identical declaratory judgment claims in the context of motions to dismiss pursuant to Rule 12(b)(6). See, e.g., Rabiner, supra, 749 F. Supp. 2d at 102 ("Plaintiff has sufficiently alleged that there is a substantial controversy concerning whether Plaintiff is required to make payments to [a fraudulently-incorporated

35

professional corporation]"); Eastern Medical, supra at p. 8 ("Defendants argue that State Farm is litigating a hypothetical theory rather than resolving a current controversy. But, quite the opposite, there is an obvious dispute between the parties, as State Farm demands a judgment that it need not pay claims it has already received from defendants, that is, one party has demanded payment, and the other denies obligation to pay. It is difficult to imagine a clearer example of a ripe dispute."); Grafman, supra, 655 F. Supp. 2d at 223 ("Here, plaintiff has sufficiently alleged that there is a substantial controversy concerning whether plaintiff is required to make payment to Milan to satisfy invoices which plaintiff contends were fraudulent.").

In the present case, GEICO has alleged the existence of an actual case or controversy, inasmuch as it has alleged that the parties dispute GEICO's liability on more than $1,396,000.00 in pending, but unpaid, fraudulent billing that has been submitted through the PC Defendants to GEICO. See Complaint at ¶¶ 98-103. This is all that is necessary at the pleading stage. See Cardinal Chem. Co. v. Morton Int'l, Inc., 508 U.S. 83, 95 (1993); see also 28 U.S.C. § 2201(a); Grafman, supra, 655 F. Supp. 2d at 222-23. Accordingly, there is no basis to dismiss GEICO's First Cause of Action.

## VII.    GEICO's Declaratory Judgment Claim is Not Subject to Arbitration

The Defendants contend that, in the event that GEICO's First Cause of Action for a declaratory judgment is not dismissed outright, it should be referred to arbitration. See Arguelles Memo at pp. 7-10. This argument lacks merit.

### A.    New York State Law, Rather Than the FAA, Governs the Arbitrability of GEICO's Declaratory Judgment Claim in This Action

As a threshold matter, though the Defendants contend that the Federal Arbitration Act governs the arbitrability of Plaintiffs' claims in this action, it is New York state law, rather than the FAA, that controls under the present circumstances. See Arguelles Memo at pp. 9-10. This is because

36

the Defendants' right to arbitrate – to the extent that they have one at all – is derived from N.Y. Ins. Law § 5106(b), a state statute, rather than from any privately negotiated contract affecting interstate commerce.

Specifically, the Defendants argue that N.Y. Ins. Law § 5106(b) and its implementing regulations supposedly mandate arbitration of the issues in this action. See Arguelles Memo at pp. 7, et seq. Section 5106(b) provides, in pertinent part, that:

> Every insurer shall provide a claimant with the option of submitting any dispute involving the insurer's liability to pay first party benefits, or additional first party benefits, the amount thereof or any other matter which may arise pursuant to subsection (a) of this section to arbitration pursuant to simplified procedures to be promulgated or approved by the superintendent.

The implementing regulation for Section 5106(b), 11 N.Y.C.R.R. § 65-1.1, requires every New York automobile insurance policy to contain the following arbitration provision:

> In the event that any person making a claim for first party benefits and the Company do not agree regarding any matter relating to the claim, such person shall have the option of submitting such disagreement to arbitration pursuant to procedures promulgated or approved by the Superintendent of Insurance.

The Defendants contend – and GEICO does not dispute – that the underlying automobile insurance policies in the present case contained the arbitration provision required by N.Y. Ins. Law § 5106(b) and its implementing regulation, 11 N.Y.C.R.R. § 65-1.1. See, e.g., Arguelles Memo at p. 8.

In this context, it is essential to note that, even if Plaintiffs had omitted the arbitration provision from their insurance policies, it would be inserted into the policies automatically by operation of New York law. Specifically, if an insurance company fails to provide the arbitration option in its insurance policies, N.Y. Ins. Law § 5103(h) supplies it by default, by providing that any no-fault policy "which does not contain provisions complying with the requirements of this article, shall be construed as if such provisions were embodied therein".

37

1.   **The FAA Applies Only to Privately Negotiated Contracts, Not to Arbitration Clauses That are Imposed on the Parties to a Contract by Operation of State Law**

With that in mind, New York state law, rather than the FAA, governs the arbitrability of

GEICO's declaratory judgment claim in the present case, because the FAA applies only to privately

negotiated contracts affecting interstate commerce, not to arbitration clauses that are imposed on the

parties to a contract by operation of state law. See, e.g., Granite Rock Co. v. Int'l Bhd. of Teamsters,

130 S.Ct. 2847, 2859-2860 (2010)(holding that courts should "appl[y] the presumption favoring

arbitration, in FAA ... cases, only where it reflects, and derives its legitimacy from, a judicial

conclusion that arbitration of a particular dispute is what the parties intended because their express

agreement to arbitrate was validly formed and . . . is legally enforceable and best construed to

encompass the dispute")(emphasis added).

For this very reason, in Excel Imaging, supra, under virtually analogous circumstances, Judge

Weinstein explicitly held that New York state law, rather than the FAA, governed arbitrability of the

insurer's claims:

> Defendants' right to arbitrate is a creation of state no-fault law. Defendants have presented no evidence that the Liberty Mutual insurance contracts bargained for the right to arbitrate affirmative fraud claims through their private agreements. As a result, New York law, rather than the Federal Arbitration Act, applies to determine whether the defendants have waived their arbitration rights. See 9 U.S.C. § 2 ("A written provision in any maritime transaction or a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an existing controversy arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract.") ... .

Excel Imaging, supra at * 29 - * 30.

Similarly, in Lyons, supra, Judge Gleeson declined to apply the FAA to a virtually-analogous

motion to compel arbitration, because the arbitration provisions in the insurer's policies were

imposed by New York state law, rather than privately negotiated between the parties:

> The Atlantic defendants emphasize that the arbitration clause ... either expressly or constructively appears in the Allstate insurance contracts. They thus contend that the broad policy favoring arbitration under the Federal Arbitration Act ("FAA"), 9 U.S.C § 2, compels me to read any ambiguities in the arbitration clause, insofar as they exist, in favor of arbitration. ... However, as the Supreme Court has made clear, courts should "appl[y] the presumption favoring arbitration, in FAA . . . cases, only where it reflects, and derives its legitimacy from, a judicial conclusion that arbitration of a particular dispute is what the parties intended because their express agreement to arbitrate was validly formed and . . . is legally enforceable and best construed to encompass the dispute." Granite Rock Co. v. Int'l Bhd. of Teamsters, 130 S. Ct. 2847, 2859-60, 177 L. Ed. 2d 567 (2010) (emphasis added). Here, local law mandates that disputes be arbitrable at the option of the claimant, and the parties' agreements — i.e., the Allstate insurance contracts — merely adhere to this mandate, parroting the words of the statute or silently adopting its provisions. Thus the parties cannot be said to have evinced an intention or bargained for the right to arbitrate affirmative fraud claims through their private agreements. See id. Rather, the manifest intention of the parties, insofar as any of their agreements explicitly included an arbitration clause, was simply to adopt and comply with local law, and I find that the best construction of the [arbitraion clause] excludes from its scope affirmative suits for fraud. I thus deny defendants' motion to compel arbitration of these claims.

Lyons, supra at * 47 - * 49; see also Volt Info. Scis. v. Bd. of Trs., 489 U.S. 468, 478 (1989)(the

FAA "simply requires courts to enforce privately negotiated agreements to arbitrate, like other

contracts, in accordance with their terms")(emphasis added); New York v. Oneida Indian Nation, 90

F.3d 58, 62 (2d Cir. 1996)(same).

If, as Judge Weinstein determined in Excel Imaging and Judge Gleeson determined in Lyons,

insurers such as Plaintiffs do not bargain for the arbitration clauses, but simply include them in the

policies in order to comply with New York law, it follows that the FAA – which requires a

bargained-for, privately negotiated arbitration clause – does not apply. Plaintiffs respectfully submit

that an arbitration clause that is imposed on an insurer by statute – to the extent that it is inserted into

a contract by operation of law if the insurer does not include it itself – is the very antithesis of a

"privately negotiated agreement to arbitrate". Accordingly, New York law, not the FAA, should

govern any question of arbitrability in the present case. But see Gov't Emples. Ins. Co. v. Grand Med.

Supply, Inc., 2012 U.S. Dist. LEXIS 92469 at * 4 - * 6 (E.D.N.Y. 2012)(explicitly declining to

follow Judge Weinstein in <u>Excel Imaging</u>, and implicitly declining to follow Judge Gleeson in <u>Lyons,</u> by holding that the FAA does apply to the arbitration provisions imposed on New York automobile insurance contracts by operation of New York state law).

**2. The FAA Does Not Apply Because the Insurance Policies at Issue Contain a New York Choice of Law Clause**

In any case, the FAA does not apply because the insurance policies at issue all contain a New York choice of law clause. Specifically, as set forth in the Kravet Decl., all of the policies underlying the Defendants' no-fault claims in the present case contain the following choice of law provision:

> **The policy and any amendment(s) and endorsement(s) are to be interpreted pursuant to the laws of the state New York.**

<u>See</u> Kravet Decl. at ¶ 4, and Exhibit 1 (emphasis added).

In light of this choice of law clause, New York law – rather than the FAA – should govern whether Plaintiffs' declaratory judgment claim in the present case is subject to arbitration.

For instance, in <u>Volt Info. Scis.</u>, <u>supra</u>, the contract contained an agreement to arbitrate all disputes between the parties "arising out of or relating to this contract or the breach thereof." <u>Id.</u>, 489 U.S. at 470. It also contained a choice-of-law clause providing that the contract would be governed by the law of the place where the project was located, namely California. <u>Id.</u> A dispute developed, appellant made a formal demand for arbitration, whereupon appellee sued appellant and others in California state court. <u>Id.</u> The appellant sought a stay of the proceedings and to compel arbitration. <u>Id.</u> The California trial court refused to stay the proceedings and stayed the arbitration pursuant to California law, because third parties were involved who were not bound by the arbitration agreement. <u>Id.</u>, 489 U.S. at 471. Appellant appealed, arguing that – even if the parties had agreed to arbitrate under California rules – application of the California law was preempted by the FAA. Nonetheless, the California appellate court affirmed, holding – as paraphrased by the Supreme Court – that:

40

> because "[t]he thrust of the federal law is that arbitration is strictly a matter of contract," ... the parties to an arbitration agreement should be "at liberty to choose the terms under which they will arbitrate." ... Where, as here, the parties have chosen in their agreement to abide by the state rules of arbitration, application of the FAA to prevent enforcement of those rules would actually be "inimical to the policies underlying state and federal arbitration law," ... because it would "force the parties to arbitrate in a manner contrary to their agreement."

Id. (Internal citations omitted).

The Supreme Court affirmed the California court and held that, while the FAA enforced

arbitration agreements in interstate commerce matters, it was not preemptive of state law where the

parties agreed in their contract to be bound thereby. Id., 489 U.S. at 472-473. As the Supreme Court

ruled:

> In recognition of Congress' principal purpose of ensuring that private arbitration agreements are enforced according to their terms, we have held that the FAA pre-empts state laws which require a judicial forum for the resolution of claims which the contracting parties agreed to resolve by arbitration. ... But it does not follow that the FAA prevents the enforcement of agreements to arbitrate under different rules than those set forth in the Act itself. Indeed, such a result would be quite inimical to the FAA's primary purpose of ensuring that private agreements to arbitrate are enforced according to their terms. Arbitration under the Act is a matter of consent, not coercion, and parties are generally free to structure their arbitration agreements as they see fit. Just as they may limit by contract the issues which they will arbitrate ..., so too may they specify by contract the rules under which that arbitration will be conducted. Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the Act would otherwise permit it to go forward. By permitting the courts to rigorously enforce such agreements according to their terms ..., we give effect to the contractual rights and expectations of the parties, without doing violence to the policies behind by the FAA.

Id., 489 U.S. at 478 (internal quotations and citations omitted).

In keeping with the Supreme Court's decision in Volt, the Second Circuit has held that

"where the state arbitration provision is not inconsistent with the FAA policy of enforcing arbitration

procedures chosen by the parties, choice-of-law clauses making no explicit reference to arbitration

commonly have been interpreted to incorporate the state's law governing the enforcement of

arbitration agreements." Sec. Ins. Co. of Hartford v. TIG Ins. Co., 360 F.3d 322, 328 (2d Cir.

2004)(Internal quotations and citation omitted); see also Motorola Credit Corp. v. Uzan, 388 F.3d 39, 51 (2d Cir. 2004)("where the parties have chosen the governing body of law, honoring their choice is necessary to ensure uniform interpretation and enforcement of that agreement and to avoid forum shopping. … Furthermore, respecting the parties' choice of law is fully consistent with the purposes of the FAA."); but see Protostorm, LLC v. Antonelli, 2010 U.S. Dist. LEXIS 52618 (E.D.N.Y. 2010)(noting criticism of Sec. Ins. Co. of Hartford, albeit not from the Second Circuit, and suggesting that it may no longer be valid).

In the present case, the insurance contracts contain a choice of law provision specifying that any disputes related to the policies are to be governed by New York law. Accordingly, the Court should apply New York state law, rather than the FAA, in determining the arbitrability of Plaintiffs' declaratory judgment claim against the Defendants.

**B.    GEICO's Declaratory Judgment Claim is Not Subject to Arbitration**

**1.    Under New York Law, the Defendants Have Waived any Right to Arbitrate GEICO's Declaratory Judgment Claim**

As discussed above, New York law – rather than the FAA – governs the arbitrability of GEICO's declaratory judgment claim. See, e.g., Excel Imaging, supra at * 29 - * 30; Lyons, supra at * 47 - * 49.

Under New York law, once a party seeking reimbursement of no-fault benefits elects to proceed with either arbitration or litigation, it generally cannot then seek redress of any subsequent issues regarding such benefits in a different forum. See, e.g., Roggio v. Nationwide Mut. Ins. Co., 66 N.Y.2d 260, 264 (1985); Digitronics Inventioneering Corp. v. Jameson, 52 A.D.3d 1099, 1100 (3d Dep't 2008); Cortez v. Countrywide Ins. Co., 17 A.D.3d 508, 509 (2d Dept. 2005). In the present case, the Defendants seek to compel arbitration of Plaintiffs' declaratory judgment claim – which seeks a declaration to the effect that the PC Defendants may not collect on their pending and unpaid

fraudulent claims – despite the fact that the Defendants already have commenced state court collections litigation on at least 450 of their pending claims, covering most of their more than $1,396,000.00 in outstanding fraudulent billing. By commencing litigation on their outstanding billing, the Defendants therefore have waived arbitration as to their outstanding billing, and may not compel arbitration of Plaintiffs' declaratory judgment claim, which is addressed to the Defendants' outstanding billing.

In Excel Imaging, supra, Judge Weinstein squarely addressed this exact same situation, determining that, under New York law, the defendant healthcare providers had waived their right to compel arbitration of an insurer's virtually identical declaratory judgment claim because the healthcare providers had commenced litigation on most of their outstanding billing. See Excel Imaging, supra at * 30 - * 31.

Likewise, in the present case, the Defendants' decision to commence litigation on the bulk of their pending billing clearly is inconsistent with their newly-minted intention to arbitrate the underlying claims. See, e.g., Sherrill v. Grayco Builders, Inc., 64 N.Y.2d 261, 272 (1985)(aggressive litigation activity effected a waiver of right to arbitrate inasmuch as it was clearly inconsistent with an intention to arbitrate); Matter of Waldman v Mosdos Bobov, Inc., 72 A.D.3d 983, 983 (2d Dep't 2011)(by commencing an action at law involving arbitrable issues, the petitioners waived whatever right they had to arbitration). Because the Defendants have elected to litigate their pending claims for no-fault benefits, they cannot now invoke the arbitration provisions of Section 5106 or the pertinent insurance policies to compel arbitration of GEICO's declaratory judgment claim in the present case. See, e.g., Com-Tech Assoc. v. Computer Assoc. Int'l, Inc., 753 F.Supp. 1078, 1086-1087 (E.D.N.Y 1990)(denying defendants' motion to compel arbitration on the ground of a waiver of right to compel arbitration where "any reasonably prudent litigator had to believe that there was an intentional

43

abandonment of the right to compel arbitration"), aff'd, 938 F.2d 1574 (2d Cir. 1991). Accordingly, their motion should be denied.

**2.    Under New York Law, Considerations of Judicial Economy and the Risk of Inconsistent Results Militate Against Arbitration of GEICO's Declaratory Judgment Claim**

Even if the Defendants had not waived their right to arbitrate Plaintiffs' declaratory judgment claim, under New York law considerations of judicial economy and the risk of inconsistent results militate strongly against arbitration of the declaratory claim.

As discussed herein, the Defendants cannot colorably contend that GEICO's civil RICO, fraud, or unjust enrichment claims are subject to dismissal, and there can be no real doubt that GEICO is entitled – at a minimum – to proceed on those claims in this forum. Were the Court to dismiss Plaintiffs' declaratory judgment claim in favor of arbitration, while retaining jurisdiction over Plaintiffs' RICO, fraud, and unjust enrichment claims, it would frustrate the interests of judicial economy and lead to inconsistent results. For instance, Plaintiffs could proceed in this action on their RICO, fraud, and unjust enrichment claims, to the effect that the Defendants have engaged in a large-scale fraudulent scheme. Meanwhile, Plaintiffs could be forced to defend hundreds of individual collections arbitrations – arising out of the same core facts as their RICO, fraud, and unjust enrichment claims – that could be disposed of with far greater efficiency in the context of the present declaratory judgment claim. The effect would be to waste the parties' time and resources, and the Court's and arbitrators' time and resources.

Furthermore, considering the expedited nature of the no-fault arbitration system, which generally permits little or no discovery, and typically provides for expedited arbitral hearings lasting 15 minutes or less, there can be little doubt that some of the arbitrators would permit the Defendants to recover on their fraudulent billing. See, e.g., 11 N.Y.C.R.R. § 65-4, et seq. (setting forth expedited procedure for no-fault arbitration). The result would be to invite decisions in the collections

44

arbitrations that are likely to conflict with the Court's decision on Plaintiffs' RICO and common law claims in the present case. The threat of conflicting decisions is underscored by the fact that no-fault arbitrations are conducted before multiple American Arbitration Association arbitrators and typically are randomly assigned amongst a group of up to 50 different arbitrators in the New York metropolitan region.

In this context, under analogous circumstances, and based on similar concerns, New York state courts repeatedly have either stayed pending no-fault arbitrations pending the disposition of declaratory judgment claims, and/or have consolidated them with declaratory judgment actions. See, e.g., GEICO Ins. Co. v. Williams, 2011 NY Slip Op 30326U at * 10 - * 11 (Sup. Ct. Nassau Cty. 2011)(in an action seeking, among other things, a declaration that defendants were not entitled to recover no-fault benefits, the Court stayed all pending no-fault arbitrations pending the outcome of the declaratory judgment action "in the interests of judicial economy" and due to the possibility of "significantly varying outcomes" if the plaintiff-insurer was required to "litigat[e] each alleged fraudulent claim separately"); AIU Ins. Co. v. Deajess Med. Imaging, P.C., 24 Misc. 3d 161, 166 (Sup. Ct. Nassau Cty. 2009)(same); Safeco Ins. Co. of Ind. v. Morel, 2009 NY Slip Op 32187U at * 3 - * 4 (Sup. Ct. Nassau Cty. 2009)(same); Autoone Ins. Co. v. Manhattan Heights Med., P.C., 2009 NY Slip Op 51663U at * 3 - * 4 (Sup. Ct. Nassau Cty. 2009)(same).

Indeed, in keeping with this authority, this Court has stayed no-fault arbitration under similar circumstances. For instance, in Excel Imaging, supra, Judge Weinstein held that:

> To the extent that defendants have not yet sued on any unpaid claims, they may compel arbitration of those claims. Permitting these individual claims to proceed to arbitration while their claim for a declaratory judgment remains pending in this court puts the plaintiffs at significant risk of multiple judgments that may be inconsistent with the ultimate decision in this case. In the interests of judicial economy, arbitration of such unpaid claims is stayed pending a decision in the present case.

Id. at * 32.

Likewise, in Government Employees Insurance Co., et al. v. Damien, et al., Docket No. CV 10-5409 (SLT)(JMA), the plaintiff-insurers moved to stay the defendants' pending no-fault collections arbitration and litigation, and to enjoin them from commencing or prosecuting any new collections arbitration and litigation, pending the disposition of, among other things, the plaintiff-insurers' declaratory judgment claim. See id. at Docket Nos. 32-34. In Damien, as in the present case, the plaintiff-insurers argued that the stay and injunction were necessary to "avoid multiple, possibly inconsistent decisions which could impact the present federal litigation" and because the "multiplicity of arbitration proceedings serves to interfere with the proceedings before the Court and poses a risk of inconsistent awards from multiple AAA arbitrators since the cases are randomly assigned among a group of as many as 50 arbitrators in the New York Metropolitan region." Id. at Docket No. 34, pp. 12-16. Judge Sandra L. Townes granted the motion. Id. at Docket No. 63.

While most of the above-mentioned cases involved a Court's decision to grant a plaintiff-insurer's motion to stay arbitration, their reasoning should apply equally to the present case, in which the Defendants seek to stay an efficient declaratory judgment action in favor of inefficient, individualized arbitration of hundreds of discrete no-fault claims. Accordingly, the Defendants' motion should be denied.

**3.     Even if the Court Were to Apply the FAA to the Present Motion, Plaintiffs Can Show the Prejudice Necessary Under the FAA to Establish That the Defendants Have Waived any Right to Compel Arbitration**

As discussed above, it seems clear that New York law, rather than the FAA, should govern any question as to whether the Defendants have waived any right to compel arbitration of Plaintiffs' declaratory judgment claim. Even so, in Grand Med. Supply, Inc., supra, Judge Cogan diverged from Judge Weinstein's decision in Excel Imaging, P.C., and Judge Gleeson's decisions in Lyons and

Khaimov, and applied the FAA in determining the arbitrability of an insurer's claims.[9] It therefore is worthwhile to note that, even if the Court were to apply the FAA to the present motion, GEICO can show the prejudice necessary under the FAA to establish that the Moving Defendants have waived any right to compel arbitration of Plaintiffs' declaratory judgment claim.

Pursuant to the FAA, "[i]n determining whether a party has waived its right to arbitration by engaging in litigation, the Second Circuit has instructed courts to consider: (1) the time elapsed from when litigation was commenced until the request for arbitration; (2) the amount of litigation to date, including motion practice and discovery; and (3) proof of prejudice." Grand Med. Supply, Inc., supra at * 21 (internal quotations and citations omitted). Prejudice is the most important of these three factors, as a party claiming waiver must demonstrate prejudice before a waiver will be found. See id.; Thysen, Inc. v. Calypso Shipping Corp., S.A., 310 F.3d 102, 105 (2d Cir. 2002). Prejudice can be substantive, i.e., when a party obtains discovery not available in arbitration or loses a motion and then attempts to relitigate that issue in arbitration, or it can be based on excessive cost and delay. See Thysen, Inc., 310 F.3d at 105.

In this context, the Second Circuit has found prejudice to support a waiver of arbitration where – among other considerations – a party seeking to arbitrate has litigated the underlying dispute to the eve of trial. See, e.g., Min Jin v. Metropolitan Life Ins. Co., 2000 U.S. App. LEXIS 16246 at * 3 - * 4 (2d Cir. 2000)(denying motion to compel arbitration made on the eve of trial, following years of litigation); In re S & R Co. of Kingston v. Latona Trucking, Inc., 159 F.3d 80, 83 (2d Cir. 1998)(denying motion to compel arbitration made on the eve of trial, following 15 months of litigation); Leadertex v. Morganton Dyeing & Finishing Corp., 67 F.3d 20, 26 (2d Cir. 1995)(denying motion to compel arbitration made "at the eleventh hour, with trial imminent"); Com-

---

[9] The plaintiff-insurers in Grand Med. Supply, Inc. moved for reconsideration of Judge Cogan's decision, but the case settled before the motion could be decided.

Tech Assocs. v. Computer Assocs. Int'l, 938 F.2d 1574, 1578 (2d Cir. 1991)(where "discovery was nearly complete and trial had been scheduled" before defendants moved to compel arbitration, "proximity of trial" supported District Court's finding that plaintiffs were prejudiced by delay).

As set forth in the accompanying Declaration of Joelle Roberts (the Roberts Decl."), in the present case the Defendants have litigated many of their pending no-fault collections lawsuits to the eve of trial. See Roberts Decl. at ¶¶ 10-11. Still more of these cases have proceeded to the summary judgment stage. Id. at ¶ 13.

Similarly, the Second Circuit has found prejudice to support a waiver of arbitration where – among other considerations – a party seeking to arbitrate previously has litigated the claim it now seeks to arbitrate and has obtained discovery in the context of that litigation that would be unavailable in the context of an arbitral proceeding. See, e.g., Nat'l Union Fire Ins. Co. of Pittsburgh, P.A. v. NCR Corp., 376 Fed. Appx. 70, 72 (2d Cir. 2010)(denying motion to compel arbitration where movant had engaged in pretrial discovery procedures not available through arbitration); Brookridge Funding Corp. v. Northwestern Human Res., Inc., 170 Fed. Appx. 170, 171 (2d Cir. 2006)(same); Latona Trucking, Inc., supra, 159 F.3d at 83-84 (same). See also Manos v. Geissler, 321 F. Supp. 2d 588, 595 (S.D.N.Y. 2004)("Defendants do not deny that they obtained pre-trial discovery in this action that would not have been available in the arbitral forum. This is sufficient when considered in light of the delay caused by defendants to demonstrate that plaintiff would be prejudiced if this Court granted defendants' motion to compel.")

As set forth in the accompanying Roberts Decl., in the present case the Defendants have forced GEICO to provide extensive discovery responses in a number of the pending no-fault collections lawsuits they have filed, including interrogatory responses, responses to notices for discovery and inspection, lay witness disclosure and expert disclosures that would not be available to

them in the context of an arbitration – particularly the expedited no-fault arbitration procedure set forth at 11 N.Y.C.R.R. § 65-4, et seq., which contemplates no substantive discovery in advance of the arbitral hearing. See Roberts Decl. at ¶ 12.

Likewise, the Second Circuit has found prejudice to support a waiver of arbitration where – among other considerations – a party "delays invoking arbitration rights while the adversary incurs unnecessary delay or expense." See, e.g., Nat'l Union Fire Ins. Co., supra, 376 Fed. Appx. at 72; Latona Trucking, Inc., supra, 159 F.3d at 84.

As is clear from the accompanying Roberts Decl., many of the Defendants' no-fault collections lawsuits date back for quite some time. See Roberts Decl. at ¶¶ 10-14. Accordingly, there can be no doubt as to whether the Defendants have been dilatory in seeking arbitration. And, as further set forth in the Roberts Decl., Plaintiffs have incurred significant expense to-date in litigating the Defendants' collections lawsuits – including the costs inherent in appearing at Court conferences, responding to the Defendants' discovery demands, engaging expert witnesses, and preparing for the trials that have been scheduled in the Defendants' collections lawsuits. See Roberts Decl. at ¶ 14.

Furthermore, Plaintiffs can demonstrate the existence of the other facts necessary to a waiver under the FAA – to wit, the time elapsed from when litigation was commenced until the request for arbitration and the amount of litigation to date, including motion practice and discovery. See Grand Med. Supply, Inc., supra at * 21. As set forth in the Roberts Decl., many of the Defendants' collections lawsuits have involved extensive litigation activity, including considerable discovery and conferences. See Roberts Decl., passim.

Accordingly, even if the Court were to apply the more stringent FAA waiver standards, the Defendants have waived any right to compel arbitration of GEICO's declaratory judgment claim.

**VIII.   To the Extent That the Court Finds a Defect, GEICO Requests Leave to Replead**

GEICO believes that its Complaint adequately alleges claims for declaratory judgment, common law and RICO violations against the Defendants.  To the extent, however, that the Court finds the Complaint to be inadequate in any manner, GEICO respectfully requests leave pursuant to Fed. R. Civ. Proc. 15(a) to serve an amended complaint, as it believes that any such inadequacies would be merely issues of technical pleading rather than substantive defects in the claims.  There is no legitimate basis to suggest that such an amendment would be futile or that the Defendants would be prejudiced. See Oliver Schools, Inc. v. Foley, 930 F.2d 248, 253 (2d Cir.1991)("Where the possibility exists that the defect can be cured and there is no prejudice to the defendant, leave to amend at least once should normally be granted as a matter of course").

## CONCLUSION

For the reasons stated herein, the Defendants' motions to dismiss or to compel arbitration should be denied in their entirety. In the event that the Court finds an inadequacy in the Complaint, GEICO should be granted leave to amend.

Dated:  October 5, 2012

Respectfully submitted,

RIVKIN RADLER LLP

By: _____
Barry I. Levy (BL 2190)
Max Gershenoff (MG 4648)
926 RXR Plaza
Uniondale, New York 11556-0926
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance Co., GEICO Indemnity Co., GEICO General Insurance Company, and GEICO Casualty Co.*

51